THE HONORABLE THOMAS S. ZILLY

1

2

3

4

5

6                           UNITED STATES DISTRICT COURT
7                    FOR THE WESTERN DISTRICT OF WASHINGTON
                                     AT SEATTLE

| | |
|---|---|
| 8  STRAITSHOT RC, LLC, a Delaware limited | |
| 9  liability company, | CASE NO. C10-268 TSZ |
|          Plaintiff, | |
| 10          v. | **FOURTH AMENDED COMPLAINT** |
| 11  TELEKENEX, INC., a Delaware corporation; | **FOR DAMAGES** |
| MARK PRUDELL and JOY PRUDELL, | |
| 12  husband and wife and the marital community | |
| composed thereof; MARK RADFORD and | |
| 13  NIKKI RADFORD, husband and wife and the | |
| marital community composed thereof, | |
| 14  JOSHUA SUMMERS and JULIA | |
| SUMMERS, husband and wife and the marital | |
| 15  community composed thereof; ANTHONY | |
| ZABIT and JANE DOE ZABIT, husband and | |
| 16  wife and the marital community composed | |
| thereof; BRANDON CHANEY and JANE | |
| 17  DOE CHANEY, husband and wife and the | |
| marital community composed thereof, | |
| 18  MAMMOTH NETWORKS, LLC, and | |
| BRIAN WORTHEN and JANE DOE | |
| 19  WORTHEN, husband and wife and the | |
| marital community composed thereof, | |
| 20          Defendants. | |

| | |
|---|---|
| 21  TELEKENEX, INC., a Delaware Corporation, | |
|          Third-Party Plaintiff, | |
| 22          v. | |
| 23  STRAITSHOT RC, LLC, a Delaware limited | |
| liability company; STEPHEN PERRY and | |
| 24  JANE DOE PERRY, and the marital | |
| community composed thereof; and ANDREW | |
| GOLD and JANE DOE GOLD, and the | |
| 25  marital community composed thereof, | |
| 26          Third-Party Defendants. | |

---

FOURTH AMENDED COMPLAINT FOR DAMAGES
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

MAMMOTH NETWORKS, LLC, a Wyoming
limited liability company,

     Third-Party Plaintiff,

   v.

CLARITAGE STRATEGY FUND, L.P., a
Cayman Islands limited partnership, and
STRAITSHOT RC, LLC, a Delaware limited
liability company,

     Third-Party Defendants.

## I. INTRODUCTION

1. This case arises out of a series of unlawful schemes agreed to and perpetrated by Defendants in order to steal the trade secrets and confidential customer information of Straitshot, to cover-up this theft through the destruction of evidence, and to continuously use the stolen trade secrets and confidential customer information in order to abscond with, and ultimately destroy, the business of Straitshot for Defendants' benefit.

## II. PARTIES

2. <u>Plaintiff Straitshot</u>.  Straitshot Communications, Inc. ("Straitshot") was a corporation organized under the laws of the State of Washington and authorized to conduct business in the State of Washington.  Its principal place of business was in Bellevue, Washington.

3. <u>Defendant Telekenex</u>.  Telekenex, Inc. ("Telekenex") is a corporation organized under the laws of the State of Delaware.  Its principal place of business is in San Francisco, California.  Telekenex maintains an office in Seattle, Washington and is registered to do business in the State of Washington.

4. <u>Defendants Prudell</u>.  Mark Prudell ("Prudell") and Joy Prudell are residents of Renton, Washington.  Mark and Joy Prudell are and were at all relevant times husband and wife, constituting a marital community under the laws of the State of Washington.  All acts performed by Prudell were for himself individually and on behalf of the marital community.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

5.      Defendants Radford.  Mark Radford ("Radford") and Nikki Radford are residents of Vancouver, Washington.  Mark and Nikki Radford are and were at all relevant times husband and wife, constituting a marital community under the laws of the State of Washington.  All acts performed by Radford were for himself individually and on behalf of the marital community.

6.      Defendants Summers.  Joshua Summers ("Summers") and Julia Summers are residents of Issaquah, Washington.  Joshua and Julia Summers are and were at all relevant times husband and wife, constituting a marital community under the laws of the State of Washington.  All acts performed by Summers were for himself individually and on behalf of the marital community.

7.      Defendants Zabit.  Anthony Zabit ("Zabit") and Jane Doe Zabit are residents of the State of California.  Anthony and Jane Doe Zabit, on information and belief, are and were at all relevant times husband and wife, constituting a marital community.  All acts performed by Zabit were for himself individually and on behalf of the marital community.  Zabit is the President of Telekenex.

8.      Defendants Chaney.  Brandon Chaney ("Chaney") and Jane Doe Chaney are residents of the State of California.  Brandon and Jane Doe Chaney, on information and belief, are and were at all relevant times husband and wife, constituting a marital community.  All acts performed by Chaney were for himself individually and on behalf of the marital community.  Chaney is the Chief Executive Officer of Telekenex.

9.      Defendant Mammoth.  Mammoth Networks, LLC ("Mammoth") is a Wyoming limited liability company.

10.      Defendants Worthen.  Brian Worthen ("Worthen") and Jane Doe Worthen are residents of the State of Wyoming.  Brian and Jane Doe Worthen, on information and belief, are and were at all relevant times husband and wife, constituting a marital community.  All acts performed by Worthen were for himself individually and on behalf of the marital community.  Worthen is the Chief Executive Officer of Mammoth.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1

### III.    JURISDICTION AND VENUE

2

11.    <u>Subject Matter Jurisdiction</u>.  Telekenex, Prudell, Radford and Summers removed

3

this lawsuit on February 12, 2010 on the basis of the RICO Act and pendent and/or supplemental

4

jurisdiction of the state law causes of action.

5

12.    <u>Venue</u>.  Venue in this removed case is proper under 28 U.S.C. 1446(a).  Venue also

6

is proper in this District pursuant to 28 U.S.C. 1391(b).

7

### IV.    FACTS

8

13.    <u>Straitshot's Business</u>.  Straitshot was a managed network service provider.

9

Straitshot enabled enterprises to share mission-critical data, voice and hosted applications between

10

multiple locations.  Most of its customers were small and medium-sized companies and all had

11

entered into service contracts with Straitshot that included a committed term, generally between

12

18-36 months or longer.

13

14.    <u>Mammoth Contract</u>.  Mammoth had been providing services to Straitshot since at

14

least early 2007.  In January 2008, as part of a strategic partnership between Mammoth and

15

Straitshot to purchase a significant amount of network capacity from Qwest Communications,

16

Mammoth entered into a contract with Straitshot to supply circuits to Straitshot (the "Mammoth

17

Contract").  Straitshot, in turn, used those circuits to build managed networks for Straitshot's

18

customers.

19

15.    <u>Mammoth Confidentiality Clause</u>.  Paragraph 10 of the Mammoth Contract

20

provides as follows:

21

> Neither Party shall disclose to any third party during the term of this
> Agreement and for one (1) year following the expiration or
> termination hereof, (a) any of the terms of this Agreement, including
> pricing; (b) the existence, negotiations, or result of any arbitrations
> or settlements hereto; or (c) any other confidential or proprietary
> information of the other Party disclosed during the term of this
> Agreement.

22

23

24

25

26

FOURTH AMENDED COMPLAINT FOR DAMAGES - 3
CASE NO. C10-268 TSZ

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

16.     <u>Telekenex's Business.</u>  According to its website, www.telekenex.com, Telekenex "is a business-grade IP service provider with a robust private international IP network" serving "enterprise voice and data customers."  Telekenex and Straitshot were competitors.

17.     <u>Telekenex Approaches Straitshot.</u>  Beginning in October 2008 and continuing through February 2009, Telekenex made overtures to Straitshot suggesting the companies consider combining their resources.  Although Straitshot supplied Telekenex with substantial information about Straitshot's business, Telekenex refused to do the same.

18.     <u>Prudell Employed by Straitshot.</u>  Prudell signed an employment contract with Straitshot effective April 18, 2007 (the "Prudell Employment Contract").  Prudell served as Straitshot's Regional Sales Director until January 16, 2009.  He was responsible for generating leads, developing opportunities, closing new sales and supporting existing customers as they developed new requirements. He retained responsibility for customer relationship management, including serving as the point of contact for customers who were experiencing difficulties with other functional areas of the company.  Since early 2008, all Straitshot opportunities – whether generated by him, Radford, a channel or wholesale partner, existing customers or any other manner – were managed from a sales perspective by Prudell and Radford.  Prudell had complete access to all confidential commercial, technical and financial information regarding Straitshot customers.

19.     <u>Prudell's Non-Competition and Confidentiality Obligation.</u>  Paragraph 7 of the Prudell Employment Contract provides:

> In the event you do not continue employment with the Company for any reason, you agree that, except to or for the benefit of the Company, its subsidiaries and affiliates, <u>you will not use or communicate or divulge to any person, firm or corporation, either directly or indirectly, any confidential or proprietary information relating to the business, customers, suppliers,</u> shareholders or other persons or entities affiliated with the Company, its parent, subsidiaries and their affiliates.  Without limiting the foregoing, all information concerning procedures and strategy of the Company, its subsidiaries, parent and their affiliates shall be deemed confidential and proprietary information.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 4
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

(Emphasis added.)

20.   <u>Prudell's Non-Solicitation Obligation</u>.  Paragraph 8 of the Prudell Employment Contract provides:

> <u>Non-Solicitation</u>.  For a period of twelve (12) months immediately following the termination of your relationship with the Company for any or no reason, whether with or without cause, <u>you shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment</u>, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for yourself or for any other person or entity.

(Emphasis added.)

21.   <u>Prudell's Obligation to Return Straitshot Documents</u>.  Paragraph 10 of the Prudell Employment Contract provides:

> <u>Technical Records</u>.  Immediately upon the Company's request and promptly upon termination of this Agreement, you shall deliver to the Company all memoranda, notes, records, reports, photographs, drawings, plans, papers, or other documents made or compiled by you in the process of carrying out, or made available to you in relation to your employment with the Company under this Agreement, and any copies or abstracts thereof, whether or not of a secret or confidential nature, and all of such memoranda and other documents shall, during and after the termination of this Agreement, be the exclusive property of the Company.

22.   <u>Radford Employment by Straitshot.</u>  Radford signed an employment contract with Straitshot effective June 1, 2007 (the "Radford Employment Contract").  Radford served as Straitshot's Regional Sales Director until January 16, 2009.  He was responsible for generating leads, developing opportunities, closing new sales and supporting existing customers as they developed new requirements.  He retained responsibility for customer relationship management, including serving as the point of contact for customers who were experiencing difficulties with other functional areas of the company.  Since early 2008, all Straitshot opportunities – whether generated by him, Prudell, a channel or wholesale partner, existing customers or any other manner

FOURTH AMENDED COMPLAINT FOR DAMAGES - 5
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

– were managed from a sales perspective by Prudell and Radford.  Radford had complete access to all confidential commercial, technical and financial information regarding Straitshot customers.

      23.   <u>Radford's Non-Competition and Confidentiality Obligation.</u>  Paragraph 6 of the Radford Employment Contract provides:

> In the event you do not continue employment with the Company for any reason, you agree that, except to or for the benefit of the Company, its subsidiaries and affiliates, <u>you will not use or communicate or divulge to any person, firm or corporation, either directly or indirectly, any confidential or proprietary information relating to the business, customers, suppliers,</u> shareholders or other persons or entities affiliated with the Company, its parent, subsidiaries and their affiliates.  Without limiting the foregoing, all information concerning procedures and strategy of the Company, its subsidiaries, parent and their affiliates shall be deemed confidential and proprietary information.

(Emphasis added.)

      24.   <u>Radford's Non-Solicitation Obligation.</u>  Paragraph 7 of the Radford Employment Contract provides:

> <u>Non-Solicitation.</u>  For a period of twelve (12) months immediately following the termination of your relationship with the Company for any or no reason, whether with or without cause, <u>you shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment,</u> or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for yourself or for any other person or entity.

(Emphasis added.)

      25.   <u>Radford's Obligation to Return Straitshot Documents.</u>  Paragraph 9 the Radford Employment Contract provides:

> <u>Technical Records.</u>  Immediately upon the Company's request and promptly upon termination of this Agreement, you shall deliver to the Company all memoranda, notes, records, reports, photographs, drawings, plans, papers, or other documents made or compiled by you in the process of carrying out, or made available to you in relation to your employment with the Company under this Agreement, and any copies or abstracts thereof, whether or not a secret or confidential nature, and all of such memoranda and other documents shall, during and after the termination of this Agreement, be the exclusive property of the Company.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

OCTOBER 2008

26.     October 10, 2008.  On October 10, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed Zabit, in California:  "I'm open for a call at any time."

27.     October 21, 2008.  On October 21, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed Chaney, in California, confidential Straitshot information regarding an opportunity to sell services to Snoqualmie Casino.  Straitshot had expended significant resources in the preceding months developing Snoqualmie Casino as a customer and Prudell and Radford had identified it in their Straitshot sales pipeline reports for months.  Despite this, Prudell and Radford perpetrated a scheme to send Telekenex confidential information regarding this sales opportunity that rightfully belonged to Straitshot.

28.     October 27, 2008.  On October 27, 2008, a Telekenex employee, in California, e-mailed Snoqualmie Casino, in Washington, to solicit business based on the referral from Prudell.

NOVEMBER 2008

29.     Restructuring of Straitshot's Business.  In November 2008, Straitshot determined that it needed to restructure its business with an infusion of new capital.

30.     Request for Deferral by Mammoth.  To accomplish this restructuring, Straitshot turned to Mammoth, its second largest circuit vendor, and requested that Mammoth defer Straitshot's payment of $120,000 of service fees that would come due in November and December 2008 until 2010.  This would give Straitshot the flexibility it needed to successfully complete the restructuring.

31.     Mammoth's Agreement to Defer Payment.  In November 2008, Worthen traveled to New York to meet with Straitshot's CEO Andrew Gold and a principal investor supporting the planned restructuring.  Worthen agreed to Straitshot's request to defer payment of $120,000 for November and December 2008 service fees until 2010 and to pay subsequent Mammoth invoices when they came due (the "Deferral Agreement").

FOURTH AMENDED COMPLAINT FOR DAMAGES - 7
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

32.   <u>Straitshot Proceeds With Planned Restructure</u>.  On the basis of Mammoth's Deferral Agreement, Straitshot determined that it could and would proceed with its restructuring plan.

33.   <u>November 11, 2008</u>.  On November 11, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed Chaney, in California, confidential Straitshot information regarding an opportunity to sell services to Shari's Restaurants.  Straitshot had expended significant resources in the preceding months developing Shari's Restaurants as a customer and Prudell and Radford had identified it in their Straitshot sales pipeline reports for months.  Despite this, Prudell and Radford perpetrated a scheme to send Telekenex confidential information regarding this sales opportunity that rightfully belonged to Straitshot.

34.   <u>November 11, 2008</u>.  On November 11, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed Chaney, in California, confidential Straitshot information regarding an opportunity to sell services to Straitshot customer Buffalo Exchange. Prudell attached a confidential Straitshot spreadsheet containing the Straitshot circuit addresses, customer phone numbers at each address, circuit capacities, circuit speeds, underlying carriers, and Straitshot's pricing, along with a copy of Straitshot's sales order for Buffalo Exchange.  Straitshot had expended significant resources in the preceding months developing Buffalo Exchange as a customer and Prudell and Radford had identified it in their Straitshot sales pipeline reports for months. Despite this, Prudell and Radford perpetrated a scheme to send Telekenex confidential information regarding this sales opportunity that rightfully belonged to Straitshot.

35.   <u>November 15-16, 2008</u>.  Prudell and Radford, while employed by Straitshot, traveled from Washington to California and back on November 15-16, 2008 to meet with Chaney at Telekenex's offices in San Francisco and discussed combining their efforts to solicit Straitshot customers to abandon their Straitshot contracts and move to Telekenex.

36.   <u>November 19, 2008</u>.  On November 19, 2008, while Prudell and Radford were employed by Straitshot, Chaney, in California, e-mailed Prudell and Radford, in Washington, that

FOURTH AMENDED COMPLAINT FOR DAMAGES - 8
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Prudell and Radford "have a very strong funnel and prospects" and expressing Chaney's interest to work out a deal with Prudell and Radford.

37.     November 19, 2008.  On November 19, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed Chaney, in California, confidential Straitshot information regarding Straitshot's largest customer Evergreen Healthcare ("Evergreen") and informed Telekenex that Evergreen Healthcare "will follow us if we are at a company that can deliver."  Prudell attached a confidential Straitshot spreadsheet containing the addresses of each of the Evergreen sites.

38.     Inviting Mammoth's Participation.  In November 2008, Prudell, in Washington, communicated with Worthen, in Wyoming, and asked Worthen if Mammoth would provide service to Straitshot customers that Prudell, Radford and Telekenex could convince to move to Telekenex's network.  At this time Mammoth was under contract with Straitshot to provide circuits to these Straitshot customers.  Prudell gave Worthen Chaney's phone number and asked Worthen to call Chaney to discuss Mammoth's role in moving Straitshot customers to Telekenex.

39.     November 22, 2008.  On or about November 22, 2008, while Mammoth was under contract with Straitshot, Worthen, in Wyoming, called Chaney, in California, and agreed to a scheme to move Straitshot's customers, without Straitshot's consent, to Telekenex's network.  Through January 12, 2009 and while Mammoth was under contract with Straitshot, Worthen, in Wyoming, had at least 11 other telephone conversations with Telekenex employees in California in furtherance of this scheme.  Worthen understood that Mammoth had the power to make a success or failure of the plan to induce Straitshot's customers to move to Telekenex's network without Straitshot's consent because a substantial percentage of Straitshot's circuits, and most of those serving Straitshot's largest and most profitable customers, ran through Mammoth's equipment and Mammoth had, from a technical standpoint, control over where Straitshot's customer circuits were directed.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

40.  November 24, 2008.  On November 24, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed Chaney, in California, and advised him that Straitshot had many circuits being supplied by Mammoth and that Worthen "wants the business to follow us if we were to move to your company.  That is why he is looking to speak with you.  The revenues should give you the ability to afford us and bring us on board.  Thanks and more to come."

41.  November 25, 2008.  On November 25, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed Chaney, in California, confidential Straitshot information regarding an opportunity to sell services to Stokes Auction Group.  This sales opportunity rightfully belonged to Straitshot.

42.  November 25, 2008.  On or about November 25, 2008, Telekenex employee Karen Salazar ("Salazar"), in California, spoke by telephone with Prudell, in Washington, regarding Prudell and Radford signing an agreement with Telekenex to forward sales opportunities – opportunities that Prudell and Radford generated while employed by Straitshot and using Straitshot's confidential information – to Telekenex in exchange for commissions.  That day, Salazar, in California, e-mailed to Prudell, in Washington, the Telekenex agent agreement and advised Prudell that she had contacted Worthen, in Wyoming, while Mammoth was under contract with Straitshot, and discussed moving Straitshot's existing customers to Telekenex's network without Straitshot's consent.

43.  November 25, 2008.  On or about November 25, 2008, while he was employed by Straitshot, Prudell, in Washington, spoke by telephone with Telekenex employee Larry Bani ("Bani"), in California, regarding Telekenex supplying quotes for the Straitshot opportunities Prudell had funneled to Telekenex.  That day, Prudell, in Washington, e-mailed to Salazar, in California, confidential Straitshot information regarding an opportunity to sell services to Joie de Vivre.  Straitshot had expended significant resources in the preceding months developing Joie de Vivre as a customer and Prudell and Radford had identified it in their Straitshot sales pipeline

FOURTH AMENDED COMPLAINT FOR DAMAGES - 10
CASE NO. C10-268 TSZ

reports for months. Despite this, Prudell and Radford sent to Telekenex confidential information regarding this sales opportunity that rightfully belonged to Straitshot.

44.     November 25, 2008.   On November 25, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed to Joie de Vivre, in California, recommending that Prudell schedule a telephone call or webinar with Joie de Vivre and Telekenex to discuss Telekenex's capability to service Joie de Vivre.

45.     November 25, 2008.   On November 25, 2008, Telekenex employee Joel Ciniero ("Ciniero"), in California, e-mailed to Prudell, in Washington, Telekenex's quote for Stokes Auction Group and advised that he "will finish the other items that we discussed and send them along."

46.     November 26, 2008.   On November 26, 2008, Ciniero, in California, e-mailed to Prudell, in Washington, Telekenex's quote for Shari's Restaurants.

47.     Prudell's e-mail address.   In November 2008, while he was a Straitshot employee, Prudell, in Washington, informed Worthen, in Wyoming, that Worthen should stop using Prudell's Straitshot e-mail address and use, instead, Prudell's personal e-mail address to discuss moving Straitshot's customers to Telekenex's network.   The purpose of this request was to prevent Straitshot from discovering Prudell's theft of Straitshot's trade secrets and confidential customer information.   Worthen, while Mammoth was under contract with Straitshot, agreed to Prudell's request.

48.     November 26, 2008.   On November 26, 2008, while he was employed by Straitshot, Radford, in Washington, e-mailed to Worthen, in Wyoming, while Mammoth was under contract with Straitshot, a request that Mammoth price circuits for Radford and Prudell to quote directly to customers, not on behalf of Straitshot.   That day, Worthen, in Wyoming, e-mailed to Radford and Prudell, in Washington, using non-Straitshot email addresses, with the requested quotes "so they could be moved to any router at the core at a later date (like Telekenex)."

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1

DECEMBER 2008

2      49.   December Payment.  Pursuant to the Deferral Agreement, in December 2008

3   Straitshot paid the outstanding Mammoth invoices for services in September and October 2008

4   and $4,050.92 of the December Mammoth invoice, leaving a deferred balance of $120,000 from

5   the November and December 2008 invoices.

6      50.   December 1, 2008.  On December 1, 2008, while he was employed by Straitshot,

7   Prudell, in Washington, left a voicemail message for Ciniero, in California, regarding the

8   Telekenex quote for Shari's Restaurants.

9      51.   December 1, 2008.  On or about December 1, 2008, while he was employed by

10   Straitshot, Prudell, in Washington, spoke by telephone with Joie de Vivre Hotels, in California,

11   about setting up a webinar for Joie de Vivre to review Telekenex's "product offering."

12      52.   December 1, 2008.  On December 1, 2008, while he was employed by Straitshot,

13   Prudell, in Washington, e-mailed to Ciniero and Salazar, in California, to advise that Prudell had

14   scheduled a meeting in California for Ciniero, Salazar and Joie de Vivre's representatives to go

15   over Telekenex's "company history, products, support colo[cation], deal."

16      53.   December 2, 2008.  On December 2, 2008, while he was employed by Straitshot,

17   Prudell, in Washington, e-mailed to Ciniero and Chaney, in California, confidential Straitshot

18   information regarding an opportunity to sell services to The Neurology Center.  Prudell attached to

19   the e-mail Straitshot's confidential service proposal for The Neurology Center.  Straitshot had

20   expended significant resources in the preceding months developing The Neurology Center as a

21   customer and Prudell and Radford had identified it in their Straitshot sales pipeline reports for

22   months.  Despite this, Prudell and Radford perpetrated a scheme to send Telekenex confidential

23   information regarding this sales opportunity that rightfully belonged to Straitshot.

24      54.   December 3, 2008.  On or about December 3, 2008, while he was employed by

25   Straitshot, Prudell, in Washington, spoke by telephone with representatives of The Neurology

26   Center, in California, about taking its business to Telekenex.  That day, Prudell, in Washington, e-

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

mailed to Ciniero and Chaney, in California, that he had spoken to The Neurology Center "and we are a go we need to have a call next week with the customer."

55. <u>December 3, 2008.</u> On December 3, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed to Chaney, in California to advise that he had scheduled a meeting with Joie de Vivre to include Ciniero and Salazar with Prudell to join by telephone. He wrote: "This is killer opportunity [sic] and a great fit for you. I have an agent in AZ and we are closing a 40 point T-1 deal in January. We would like to visit them and set up a training so we can sell the customer Telekenex."

56. <u>December 3, 2008.</u> On December 3, 2008, while he was employed by Straitshot, Radford, in Washington, e-mailed to Salazar, Chaney, and Ciniero, in California, the Telekenex agency agreement with Radford's signature.

57. <u>December 9, 2008.</u> On December 9, 2008, while he was employed by Straitshot, Prudell, in Washington, e-mailed to Ciniero and Chaney, in California regarding The Neurology Center stating that "we need to get Terry a sales order and MSA [Master Service Agreement]. Do you have time for a call with him he wants to sign paper."

58. <u>December 12, 2008</u>. On December 12, 2008, while they were employed by Straitshot, Prudell and Radford, in Washington, spoke by telephone with Chaney, in California about how Telekenex would solicit Straitshot's customers by calling and e-mailing the customers with confidential Straitshot customer information to be supplied by Prudell and Radford.

59. <u>December 17-22, 2008.</u> While Mammoth was under contract with Straitshot, Worthen traveled from Wyoming to Seattle, Washington for a visit from December 17-22, 2008 and stayed in Prudell's home and, on information and belief, discussed the plan for Mammoth to move Straitshot's customer circuits, without Straitshot's consent, to Telekenex.

60. <u>December 30, 2008.</u> On December 30, 2008, while he was employed by Straitshot, Prudell, in Washington, sent an instant message to Worthen, in Wyoming, while Mammoth was under contract with Straitshot, stating: "Mark and I have a Telekenex call with the CEO on the 7th."

FOURTH AMENDED COMPLAINT FOR DAMAGES - 13
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

JANUARY 2009

61.   _Mammoth Supplies Confidential Information to Telekenex._  In January 2009, without Straitshot's knowledge or permission, Mammoth advised Telekenex of confidential and proprietary Straitshot information including what circuits Mammoth was supplying to Straitshot, the dates those circuits were installed, the terms of the Mammoth circuits being provided to Straitshot, and the prices Mammoth was charging Straitshot for those circuits.

62.   _January Payment._  Pursuant to the Deferral Agreement, in January 2009 after Mammoth issued the January 2009 invoice, Straitshot paid the invoice.

63.   _January 7, 2009._  On January 7, 2009, while Mammoth was under contract with Straitshot, Worthen, in Wyoming, spoke by telephone with Prudell, in Washington, regarding the benefits of Prudell and Radford going to work for Telekenex.

64.   _January 7, 2009._  On January 7, 2009, while they were employed by Straitshot, Prudell and Radford, in Washington, spoke by telephone with Chaney, in California, regarding Straitshot customers that Prudell and Radford would solicit if Telekenex hired Prudell and Radford.  That day, following the phone call, Radford, in Washington, e-mailed to Chaney, in California, a list of the top Straitshot customers that Prudell and Radford had "a high probability" of being able to successfully solicit if hired by Telekenex including Straitshot customers Evergreen and The Ram Restaurants.

65.   _January 10, 2009._  On January 10, 2009, while Mammoth was under contract with Straitshot and in response to Straitshot's request to Mammoth for pricing of additional circuits for Straitshot customer Super Supplements, Worthen, in Wyoming, e-mailed Prudell and Radford, in Washington, asking:  "Will Super Supplements wind up with Telekenex?  Let's plan that out."

66.   _January 12, 2009._  On January 12, 2009, Chaney and Zabit, in California, spoke by telephone with Prudell and Radford, in Washington, and offered Prudell and Radford employment with Telekenex.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 14
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

67.     <u>January 13, 2009</u>.  On January 13, 2009, Chaney and Zabit, in California, spoke by telephone with Prudell and Radford, in Washington, regarding the terms of Telekenex's offers of employment to Prudell and Radford.

68.     <u>January 13, 2009</u>.  On January 13, 2009, Chaney, in California, e-mailed to Radford and Prudell, in Washington, Telekenex's written offers of employment.

69.     <u>January 14, 2009</u>.  On or about January 14, 2009, while he was employed by Straitshot, Prudell called Straitshot customer Evergreen and asked Evergreen to move its business from Straitshot to Telekenex.  That day, Prudell, in Washington, e-mailed Chaney and Zabit, in California and reported that he "spoke to Evergreen and they want a call with you and Mammoth tomorrow. ☺  Also please call Brian [Worthen] at Mammoth … and get the cross connects on order ASAP.  Anthony [Zabit] or Brandon [Chaney] please call me on my cell …."  The cross connects referenced were the circuitry required to connect Mammoth's network to Telekenex's network to facilitate the plan to move Straitshot's existing customers to Telekenex's network without Straitshot's consent.

70.     <u>January 14, 2009</u>.  On January 14, 2009, while Mammoth was under contract with Straitshot, Worthen, in Wyoming, e-mailed Zabit, Chaney, and Telekenex employee John Holst ("Holst"), in California, regarding "Network planning, timeline:"

> I would like to visit your offices and meet with the three of you when possible.  I will be in Denver most of next week, and could fly out at your convenience.  It would be even more beneficial if we could time a visit while Mark Prudell is at your office to establish a transition plan – I am well-versed in what can be transitioned and how quickly.  Please advise.

The transition plan Worthen referred to was a key component of the plan to move Straitshot customers to Telekenex's network without Straitshot's consent with the use of Straitshot's confidential and proprietary information communicated by Mammoth to Telekenex.  Worthen informed Zabit, Chaney and Holst that Mammoth would continue to provide services to Straitshot until the cross-connect between Mammoth and Telekenex could be built and the Straitshot

FOURTH AMENDED COMPLAINT FOR DAMAGES - 15
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

customers moved to Telekenex.  Mammoth did not advise Straitshot of Mammoth's intent to cut off services to Straitshot as soon as the cross-connect with Telekenex was completed.

71.     January 15, 2009.  On January 15, 2009, while he was employed by Straitshot, Prudell, in Washington, spoke by telephone with Worthen, in Wyoming, while Mammoth was under contract with Straitshot, in furtherance of the plan to move Straitshot's customer circuits off Straitshot's network and onto Telekenex's network without Straitshot's consent.

72.     January 15, 2009.  On January 15, 2009, Holst, in California, e-mailed Worthen, in Wyoming, while Mammoth was under contract with Straitshot, to make arrangements for a connection from Mammoth's network to Telekenex's network for use in the schemes to move the Straitshot customers' circuits from Straitshot to Telekenex without Straitshot's consent.

73.     January 16, 2009.  On January 16, 2009, Prudell submitted his resignation to Straitshot.

74.     January 16, 2009.  On January 16, 2009, Radford submitted his resignation to Straitshot.

75.     Prudell and Radford Take Straitshot's Documents.  When they quit their Straitshot jobs, Prudell and Radford retained copies of Straitshot's confidential information about its customers including names, contacts, circuit addresses, circuit sizes, network architecture and configuration data, contract dates and terms, and contract prices.  Prudell and Radford took an electronic copy of large sections of Straitshot's CRM database, containing confidential Straitshot customer names, addresses and phone numbers and provided the electronic copy to Telekenex for use in soliciting Straitshot's customers.

76.     Prudell and Radford Solicit Straitshot's Employees.  Upon leaving their employment with Straitshot, Prudell and Radford successfully solicited Straitshot engineers Josh Summers, Sunil Modi, Justin Pauole, Scott McKay, and Stephan Dickason to leave Straitshot and come to Telekenex.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 16
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

77. <u>January 20-22, 2009</u>.  Prudell and Radford traveled from Washington to California and back on January 20-22, 2009 to meet with Chaney, Zabit and others at Telekenex's San Francisco, California office to plan for the solicitation of Straitshot's customers, using the stolen Straitshot confidential customer information without Straitshot's consent.

78. <u>Straitshot Puts Telekenex on Notice of Prudell's Obligations to Straitshot</u>.  On January 20, 2009, Straitshot's counsel wrote Chaney and Prudell that Straitshot had learned of Prudell's employment with Telekenex and put Telekenex on notice that Prudell's Straitshot Employment Contract prohibited him from wrongfully soliciting Straitshot customers.  The letter expressed Straitshot's expectation "that Telekenex will not take any steps to interfere with the contractual obligations of Mr. Prudell or any other former Straitshot employees to Straitshot or with Straitshot's relationships with its customers."

79. <u>January 20, 2009</u>.  On January 20, 2009 while Mammoth was under contract with Straitshot, Zabit, in California, e-mailed Worthen, in Wyoming, and Prudell and Radford to advise that Telekenex was establishing connections to Mammoth's networks emulating Straitshot's connections to Mammoth's networks to effectuate the schemes to move Straitshot's customer circuits off Straitshot's network and onto Telekenex's network and saying:  "LETS GET THIS DONE!!!!!!!," referring to the Defendants' schemes to move Straitshot customers to Telekenex's network without Straitshot's consent.  That day, Worthen, in Wyoming, e-mailed Zabit, in California, and Prudell and Radford to advise of the prices for making the connection between Mammoth's and Telekenex's networks.

80. <u>Summers' Employment by Straitshot</u>.  Summers signed an employment contract with Straitshot effective October 2, 2006.  Initially, Summers served as a Senior Network Engineer.  Beginning in early 2008, he was promoted to Director of Engineering and was responsible for managing Straitshot's technical infrastructure, internal systems, customer networks, and technical requirements.  He had access to all of the Internet Protocol addresses and passwords required to access the hardware and software systems on Straitshot's network,

FOURTH AMENDED COMPLAINT FOR DAMAGES - 17
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

including access instructions for Straitshot's internal servers.  He was part of the Straitshot senior management team and was privy to all key strategic decisions and had full access to all confidential financial information regarding Straitshot.

81.     January 21, 2009.  On January 21, 2009, while Mammoth was under contract with Straitshot, Worthen, in Wyoming, called Summers, in Washington, to discuss the "Straitshot situation" and the schemes to move Straitshot's customer circuits to Telekenex's network without Straitshot's consent.

82.     January 22, 2009.  On January 22, 2009, Zabit, in California, e-mailed Worthen, in Wyoming, while Mammoth was under contract with Straitshot, requesting that Worthen quote prices for Mammoth to provide Telekenex circuits for the Straitshot customers.  Zabit attached a Straitshot spreadsheet with confidential information about Straitshot's customer networks that he obtained from Prudell and Radford.  That day, Worthen, in Wyoming, e-mailed Zabit, in California, with the Mammoth pricing for Telekenex to take over all of the Straitshot customer circuits being supplied to Straitshot by Mammoth.

83.     January 22, 2009.  On January 22, 2009, using confidential Straitshot customer information, Zabit, in California, called Straitshot customer Puget Sound Gastroenterology ("PSG"), in Washington, and falsely informed PSG that Straitshot was going out of business and solicited PSG to abandon its contract with Straitshot and sign on with Telekenex at the same prices Straitshot was charging PSG.  Based on Mammoth's agreement to seamlessly switch the Straitshot customers from Straitshot's network to Telekenex's network, the Defendants were able to promise PSG a seamless transition from Straitshot to Telekenex.  Without Mammoth's participation in the scheme and access to Straitshot's proprietary customer information, Telekenex would have had to undertake the laborious and time-consuming task of rebuilding the PSG circuits from the ground up, vastly increasing the costs and business risks for PSG.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

84.   <u>January 22, 2009.</u>  On January 22, 2009, while Mammoth was under contract with Straitshot, Worthen, in Wyoming, e-mailed Zabit and Chaney, in California, and Prudell and Radford:

> I will have agreements and information to you by mid-afternoon tomorrow.  This will include all circuits I'm billing the other provider [Straitshot] and the rate I would invoice Telekenex at.  This will include recommended replacements for legacy frame circuits [currently being used by Straitshot].  By the time I conduct the circuit review, the markup difference will be a wash with the cost-savings I suggest.  Don't fret….

The following day, Zabit, in California, e-mailed in response to Worthen, in Wyoming, and Prudell and Radford, in Washington, requesting that Mammoth "also include [Straitshot] install date and term/remaining term as we are negotiating this item with customers."  While Mammoth was under contract with Straitshot and bound by the confidentiality provisions in its agreement with Straitshot, Worthen agreed to Zabit's request and provided the confidential contract terms and prices Mammoth was charging Straitshot.

85.   <u>January 23, 2009.</u>  In response to the January 20, 2009 letters to Telekenex and Prudell from Straitshot's counsel, Telekenex requested a copy of the Prudell Employment Contract and Prudell, in Washington, sent an e-mail stating: "All we signed was an agreement to not solicit the SS employs [sic].  We are golden."  Copied on Prudell's e-mail were Radford, in Washington, and Chaney, Zabit, Telekenex's Chief Financial Officer Bob Finley, and Telekenex's General Counsel Glenn Stover, in California.

86.   <u>January 23, 2009.</u>  On January 23, 2009, using stolen confidential Straitshot customer information, Radford, in Washington, e-mailed Salazar and Zabit, in California, and Prudell regarding the "top 7 opp[ortunitie]s" to solicit Straitshot customers and explained that Straitshot customer "PSG is the priority today."

87.   <u>January 23, 2009.</u>  On January 23, 2009, using stolen confidential Straitshot customer information, Prudell called PSG and falsely informed PSG that Straitshot was going out

FOURTH AMENDED COMPLAINT FOR DAMAGES - 19
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

of business and solicited PSG to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging PSG.

88.   <u>January 23, 2009.</u>  On January 23, 2009, using stolen confidential Straitshot customer information, Radford, in Washington, spoke by telephone with Salazar, in California, regarding the "top 7 opp[ortunitie]s" to solicit Straitshot customers and how Telekenex would structure the contracts for these customers.

89.   <u>January 23, 2009.</u>  On January 23, 2009, using stolen confidential Straitshot customer information, Salazar, Zabit and Chaney, in California, and Prudell, in Washington, called Straitshot customer Evergreen, in Washington, and falsely informed Evergreen that Straitshot was going out of business and solicited Evergreen to abandon its contract with Straitshot and execute a services contract with Telekenex.  Based on Mammoth's agreement to seamlessly switch the Straitshot customers from Straitshot's network to Telekenex's network, the Defendants were able to promise Evergreen a seamless transition from Straitshot to Telekenex.  Without Mammoth's participation in the scheme and access to Straitshot's confidential customer information, Telekenex would have had to undertake the laborious and time-consuming task of rebuilding the Evergreen circuits from the ground up, vastly increasing the costs and business risks for Evergreen.

90.   <u>January 23, 2009.</u>  On January 23, 2009, using stolen confidential Straitshot customer information, Prudell called Straitshot customer U.S. Bearings ("USB") and falsely informed USB that Straitshot was going out of business and solicited USB to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging USB.  Based on Mammoth's agreement to switch the Straitshot customers from Straitshot's network to Telekenex's network, Prudell promised USB that this "should look like a billing change to you."  Without Mammoth's participation in the scheme, Telekenex would have to undertake the laborious and time-consuming task of rebuilding the USB circuits from the ground up, vastly increasing the costs and business risks for USB.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 20
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

91.     January 23, 2009.  On January 23, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Evergreen and asked Salazar to propose a Telekenex contract for the services outlined in the Straitshot spreadsheet.

92.     January 23, 2009.  On January 23, 2009, using stolen confidential Straitshot customer information, Prudell called Straitshot Customer Super Supplements and falsely informed Super Supplements that Straitshot was going out of business and solicited Super Supplements to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Super Supplements.  Based on Mammoth's agreement to seamlessly switch the Straitshot customers from Straitshot's network to Telekenex's network, Prudell was able to promise Super Supplements a seamless transition from Straitshot to Telekenex.  Without Mammoth's participation in the scheme and access to Straitshot's confidential customer information, Telekenex would have had to undertake the laborious and time-consuming task of rebuilding the Super Supplements circuits from the ground up, vastly increasing the costs and business risks for Super Supplements.

93.     January 23-26, 2009.  While employed by Straitshot, Summers traveled from Washington to California and back on January 23-26, 2009 to meet with Zabit at Telekenex's offices in San Francisco and to plan for Summers' employment with Telekenex and the solicitation of Straitshot's customers.

94.     January 24, 2009.  On January 24, 2009, using confidential Straitshot customer information and while Mammoth was under contract with Straitshot, Worthen, in Wyoming, e-mailed Prudell, in Washington, with a quote for a circuit for Straitshot customer Super Supplements and asked:  "Shall I contract this as Telekenex?"

95.     January 24, 2009.  On January 24, 2009, while Mammoth was under contract with Straitshot, Worthen, in Wyoming, e-mailed Zabit, in California, and Prudell and Radford, in

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Washington, with a spreadsheet containing confidential information about Straitshot's customer

networks, including the prices Mammoth was charging Straitshot for the underlying circuits, and

the price Mammoth would charge Telekenex to move the customers from Straitshot's network to

Telekenex's network and asked "what Telekenex [was] going to do to sweeten the pot" for

Worthen and Mammoth as additional compensation for Worthen's participation in the conspiracy.

96.    January 25, 2009.  On January 25, 2009, while Mammoth was under contract with

Straitshot, Worthen, in Wyoming, e-mailed Zabit, in California, and Prudell and Radford, in

Washington, the contracts for Telekenex to execute which would authorize the interconnection

between Telekenex's network and Mammoth's network that would allow Mammoth to move

Straitshot's customers to Telekenex's network and avoid the laborious and time-consuming need

for Telekenex to build the circuits from the ground up.

97.    January 25, 2009.  On January 25, 2009, Radford, in Washington, e-mailed to

Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot

spreadsheet containing confidential information about Straitshot's network for USB and asked

Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

98.    January 25, 2009.  On January 25, 2009, Radford, in Washington, e-mailed to

Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot

spreadsheet containing confidential information about Straitshot's network for Straitshot customer

Norco and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot

spreadsheet.

99.    January 25, 2009.  On January 25, 2009, Radford, in Washington, e-mailed to

Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot

spreadsheet containing confidential information about Straitshot's network for Straitshot customer

Daniel Parmele Law and asked Salazar to prepare a Telekenex contract for the services outlined in

the Straitshot spreadsheet.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

100.   <u>January 25, 2009.</u>  On January 25, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Electrical Wholesale Supply ("EWS") and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

101.   <u>January 25, 2009.</u>  On January 25, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer The Ram and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

102.   <u>January 25, 2009.</u>  On January 25, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential customer information about Straitshot's proposed network for customer Buffalo Exchange and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

103.   <u>January 26, 2009.</u>  On January 26, 2009, using stolen confidential Straitshot customer information, Chaney, in California, spoke by telephone with Straitshot customer PSG, in Washington, and falsely informed PSG that Straitshot was going out of business and solicited PSG to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging PSG.

104.   <u>January 26, 2009.</u>  On January 26, 2009, using stolen confidential Straitshot customer information, Prudell spoke by telephone with Straitshot customer The Ram and falsely informed The Ram that Straitshot was going out of business and solicited The Ram to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging The Ram.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

105.    Prudell Threatens Straitshot Investor.  On January 26, 2009, Prudell, in Washington, called Stephen Perry, CEO of the manager of Straitshot's primary investor, in New York.  Perry told Prudell that using confidential Straitshot information Prudell had acquired while an employee of Straitshot to solicit Straitshot customers on behalf of Telekenex was unlawful. Prudell informed Perry that Prudell was not acting as a "lone wolf" and that Telekenex's executive team was fully aware of what he was doing and would protect him.  Prudell threatened that he would report a purported Straitshot "tax problem" to the IRS if Straitshot sued him.  Perry instructed Prudell to report any such tax problem to the IRS immediately.  Several days later, Perry reported the substance of Prudell's comments to Zabit.

106.    January 26, 2009.  On January 26, 2009, Telekenex offered employment to Summers beginning February 10, 2009.  On January 28, 2009, Summers accepted the Telekenex job offer, but did not inform Straitshot thereof.

107.    Summers Takes Straitshot's Laptop and Confidential Information.  Summers took from Straitshot a laptop belonging to Straitshot along with confidential Straitshot customer documents and data that showed how each Straitshot customer's network was built, what kind of circuits each Straitshot customer had, what the IP addresses were of the Straitshot customer circuits, when Straitshot had installed its customer circuits, who the underlying carriers were for the Straitshot customer circuits, and the amount of Straitshot monthly revenue derived from each of the Straitshot customers and other valuable confidential information belonging to Straitshot. Summers uploaded the confidential Straitshot customer documents from Straitshot's laptop on to Telekenex's network for use by Telekenex staff in soliciting and moving Straitshot customers from Straitshot's network to Telekenex's network.  Summers used the stolen Straitshot documents on the Straitshot laptop to build spreadsheets to plan the movement of Straitshot's customers to Telekenex's network.  In an attempt to cover-up his theft of Straitshot's confidential customer information, and despite the Second Temporary Restraining Order entered by the King County Superior Court on February 13, 2009 (the "Second TRO") specifically prohibiting the altering of

any documents on the Straitshot laptop, Summers attempted, ineffectively, to delete all of the documents from the Straitshot laptop.  When Summers finally complied with the Court's order to return the laptop to Straitshot two months after leaving Straitshot, a forensic examination of the computer uncovered the attempted destruction of evidence and recovered the documents.

108.    January 26, 2009.  On January 26, 2009, using stolen confidential Straitshot customer information, Prudell e-mailed to Straitshot customer PSG Telekenex contracts for the services being provided to PSG under contract with Straitshot.

109.    January 26, 2009.  On January 26, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Super Supplements and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

110.    January 26, 2009.  On January 26, 2009, using stolen confidential Straitshot customer information, Prudell, in Washington, spoke by telephone with Straitshot customer Evergreen's agent Renee Bowman ("Bowman"), in Oregon, and falsely informed Bowman that Straitshot was going out of business and solicited Evergreen to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Evergreen.

111.    January 26, 2009.  On January 26, 2009, using stolen confidential Straitshot customer information, Prudell, in Washington, e-mailed Zabit, in California, Worthen, in Wyoming, and Straitshot customer PSG, in Washington, requesting that Mammoth, while Mammoth was under contract with Straitshot, complete a circuit order for PSG previously placed by PSG with Straitshot.

112.    January 26, 2009.  On January 26, 2009, using stolen confidential Straitshot customer information, Prudell e-mailed Straitshot customer Boys and Girls Club and asked that Boys and Girls Club call Prudell.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 25
CASE NO. C10-268 TSZ

113. <u>January 26, 2009.</u>  On January 26, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer A-Dec and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

114. <u>January 26, 2009.</u>  On January 26, 2009, using stolen confidential Straitshot customer information, Prudell and Radford, in Washington, called USB's agent Carol Sorenson ("Sorenson"), in Oregon, and falsely informed Sorenson that Straitshot was going out business and solicited USB to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging USB.

115. <u>January 26, 2009.</u>  On January 26, 2009, using stolen confidential Straitshot customer information, Prudell and Radford, in Washington, and Zabit and Bani, in California, called Straitshot customer The Ram, in Washington, and falsely informed The Ram that Straitshot was going out of business and solicited The Ram to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging The Ram.

116. <u>January 26, 2009.</u>  On January 26, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Steen Outdoor Advertising ("Steen") and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

117. <u>January 26, 2009.</u>  On January 26, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Velocity Express and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 26
CASE NO. C10-268 TSZ

118.   <u>January 26, 2009.</u>  On January 26, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Pacific Housing Advisors and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

119.   <u>January 26, 2009.</u>  On January 26, 2009, using stolen confidential Straitshot customer information, Salazar, in California, e-mailed to Radford and Prudell, in Washington, the Telekenex contract for use in soliciting Straitshot customer Super Supplements.

120.   <u>January 26, 2009.</u>  On January 26, 2009, using stolen confidential Straitshot customer information, Radford e-mailed to Straitshot customer Super Supplements the proposed Telekenex contract and requested that Super Supplements participate in a telephone call with Telekenex to discuss the proposed contract.

121.   <u>January 26, 2009.</u>  On January 26, 2009, Radford, in Washington, e-mailed Zabit, Chaney, Salazar, Bani and Ciniero, in California, and Prudell, in Washington to celebrate the first successes in Defendants' conspiracy, announcing Telekenex's successful efforts to induce Straitshot's customers to abandon Straitshot for Telekenex:

> We just got out Evergreen, US Bearing, and Super Supplements.
> Joel [Ciniero] also finished up the RAM waiting for Karen
> [Salazar]'s review.  Next in order of priority should be Boys and
> Girls Club, Norco, Pacific Housing Advisors, and Velocity Express.
> I believe that leaves A-Dec, Steen, Electrical Wholesale, and DPL,
> in the que [sic].

122.   <u>January 27, 2009.</u>  On January 27, 2009, using stolen confidential Straitshot customer information, Radford e-mailed to Straitshot customer The Ram the proposed Telekenex contract and requested that The Ram participate in a telephone call with Telekenex to discuss the proposed contract.

123.   <u>January 27, 2009.</u>  On January 27, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot

FOURTH AMENDED COMPLAINT FOR DAMAGES - 27
CASE NO. C10-268 TSZ

spreadsheet containing confidential information about Straitshot's network for Straitshot customer Tenet Federal Credit Union and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

124.   January 27, 2009.  On January 27, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Ace Hardware and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

125.   January 27, 2009.  On January 27, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Alpine Mortgage and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

126.   January 27, 2009.  On January 27, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Boys and Girls Club and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

127.   January 27, 2009.  On January 27, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Bastian Material Handling and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

128.   January 27, 2009.  On January 27, 2009, using stolen confidential Straitshot customer information and while Mammoth was under contract with Straitshot, Prudell, in Washington, e-mailed to Zabit and Chaney, in California, Worthen, in Wyoming, and Straitshot

customer Norco, in Idaho, to schedule a time for Telekenex to call Norco to solicit Norco to abandon its contract with Straitshot and execute a services contract with Telekenex.

129.   <u>January 27, 2009.</u>  On January 27, 2009, using stolen confidential Straitshot customer information, Salazar, in California, e-mailed to Radford and Prudell, in Washington, and Chaney and Zabit, in California, the Telekenex contract for use in soliciting Straitshot customer EWS and to advise that Telekenex contracts for Straitshot customers "Norco, Pacific Housing, Boys & Girls Club & others are following soon."

130.   <u>January 27, 2009.</u>  On January 27, 2009, Prudell, in Washington, e-mailed Zabit, Chaney and Bani, in California, and Radford, in Washington, to suggest that Prudell and Radford supply stolen confidential information about Straitshot's customers to other salespeople at Telekenex so those salespeople could solicit Straitshot customers to abandon their contracts with Straitshot and execute service contracts with Telekenex.

131.   <u>January 27, 2009.</u>  On January 27, 2009, using stolen confidential Straitshot customer information, Radford, in Washington, e-mailed Straitshot customer Norco, in Idaho, Zabit and Chaney, in California, Prudell, in Washington, and Zabit, in Wyoming, the proposed Telekenex contract and requested that Norco participate in a telephone call with Telekenex to discuss the proposed contract.  While Mammoth was under contract with Straitshot, Worthen, in Wyoming, e-mailed in response to Prudell, in Washington:  "Bang this one out!"

132.   <u>January 27, 2009.</u>  On January 27, 2009, using stolen confidential Straitshot customer information, Radford e-mailed to Straitshot customer Boys and Girls Club the proposed Telekenex contract and requested that Boys and Girls Club participate in a telephone call with Telekenex to discuss the proposed contract.

133.   <u>Straitshot Puts Telekenex and Prudell on Further Notice of Straitshot's Rights.</u>  On January 28, 2009, Straitshot's counsel wrote to Zabit a letter that was copied on Prudell, Radford, Chaney, Stover and Finley, as follows:

> It has since come to our attention that Telekenex also has hired former Straitshot Communications employee Mark Radford.

1
2
3
4
5
6

> Please be advised that completely independent from the non-solicitation issue we raised previously, Mesrrs. Prudell and Radford are prohibited from disclosing to, or using on behalf of, Telekenex information about Straitshot Communications' customers including their names, contact information, information about the services they purchased from Straitshot Communications, and the dates upon which the customer contracts with Straitshot are set to expire. This information is a protected trade secret under the Uniform Trade Secrets Act, Chapter 19.108 RCW and under their employment contracts.

7   The January 28 letter specifically quoted the Non-Competition and Confidentiality Obligation

8   provision of the Prudell and Radford Employment Contracts. Furthermore, the letter stated:

9
10

> Information about Straitshot Communications' customers is a trade secret which Mesrrs. Prudell and Radford are bound to keep confidential.

11
12

> The Washington Supreme Court reaffirmed this principle in *Ed Nowogroski Insurance, Inc. v. Rucker*, 137 Wn.2d 427 (1999). The Court explained:

13
14
15
16

> > Absent a contract to the contrary, an employee is free to compete against his or her former employer, and a former employee may use general knowledge, skills and experience acquired during the prior employment in competing with a former employer. <u>However, an employee may not use or disclose trade secrets belonging to the former employer to actively solicit customers from a confidential customer list.</u>

17
18

> *Id.* at 450. The fact that the former employee recalls the customer information from memory is of no import. *Id.*

19
20
21
22
23
24
25

> Consequently, Mesrrs. Prudell and Radford are prohibited from disclosing confidential information about Straitshot Communications' customers including, without limitation, their identity, the nature of their agreements with Straitshot Communications, and the termination date of their contracts with Straitshot. Use of Straitshot Communications' trade secrets in violation of their contracts and statutory law will result in personal liability for each of these former employees. Additionally, as the Supreme Court recognized in *Nowogroski*, a subsequent employer who permits former employees of a competitor to use such confidential information on behalf of the new employer will be held liable for interference with contractual obligations and resulting damages to the former employer.

26

FOURTH AMENDED COMPLAINT FOR DAMAGES - 30
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

We were alarmed to read the January 23 e-mail from Mr. Prudell ("All we signed was an agreement to not solicit the SS employs [sic]. We are golden.") suggesting he intends to use (or has already used) Straitshot Communications' trade secrets in his work for Telekenex. In fact, we have spoken with a number of current customers who report that Mr. Prudell is not only utilizing his knowledge of Straitshot Communications' trade secrets but that he is also misrepresenting himself as somehow "working with" Straitshot Communications in "transitioning customers" to Telekenex. The resulting impact on Straitshot's business and consequential damages is enormous. Mr. Prudell's e-mail indicates that you and various persons at Telekenex are aware of Mr. Prudell's activities. The exposure that you and various individuals at Telekenex, as well as the company itself, face is clear. We further understand that your group is currently soliciting employees of Straitshot. This conduct further demonstrates the ill-advised activities of individuals at your company, the company itself, as well as Mr. Prudell. Given what we have learned, we are investigating Telekenex' conduct in this matter.

We expect that Telekenex will abide by Washington law and will refrain from competing with Straitshot Communications in any manner that makes use of Straitshot Communications' confidential customer information obtained from any of Straitshot Communications' former employees or misrepresents the nature of the employees' current employment. Please confirm immediately that this is the case.

Equivalent letters were sent directly to Prudell and Radford on January 28, 2009 and copied on the above-mentioned Telekenex executives.

134. January 28, 2009. On January 28, 2009, using stolen confidential Straitshot customer information, Prudell spoke by telephone with Straitshot customer The Ram to solicit The Ram to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging The Ram.

135. January 28, 2009. On January 28, 2009, using stolen confidential Straitshot customer information, Prudell and Radford, in Washington, and Zabit, Chaney, and Bani, in California, spoke by telephone with Straitshot customer Norco, in Idaho, to solicit Norco to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Norco.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 31
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

136.   <u>January 28, 2009.</u>  On January 28, 2009, using stolen confidential Straitshot customer information and while he was a Straitshot employee, Summers e-mailed Straitshot customer The Ram to explain, from a technical perspective, the difference between Straitshot's network for The Ram and the proposed Telekenex network for The Ram and how Telekenex intended to accomplish the move of The Ram's network off Straitshot's circuits.

137.   <u>January 28, 2009.</u>  On January 28, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing stolen confidential information about Straitshot's network for Straitshot customer Black Angus and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

138.   <u>Telekenex Hires Straitshot's Engineers.</u>  Telekenex knew of the Straitshot Employment Contracts which prohibited Prudell and Radford from soliciting Straitshot employees.  Nonetheless, fully aware that Prudell and Radford were soliciting Straitshot's engineers, Telekenex immediately hired the four remaining Straitshot engineers.

139.   <u>The Loss of its Engineers Was Devastating to Straitshot.</u>  The loss of its entire engineering department, at once, immediately following the departure of Prudell and Radford, was devastating for Straitshot.

140.   <u>Summers Refused to Provide Straitshot With its Mission Critical Data.</u>  The loss caused Straitshot by the overnight departure to Telekenex of its entire engineering department was compounded by Summers' refusal, while he remained a Straitshot employee, to provide to Straitshot's management Straitshot's mission critical data.  While Summers was a Straitshot employee, Straitshot's CEO instructed Summers to document for Straitshot all of Straitshot's IP addresses and passwords required to access the hardware and software systems in Straitshot's network, and instructions for accessing Straitshot's internal servers and CRM database.  Despite repeated requests that Summers provide this critical information to Straitshot so that it could continue to operate its business and support its customers, Summers stubbornly refused to provide

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

to Straitshot the information about its own systems.  In stark contrast, Summers willingly supplied this same highly confidential and valuable Straitshot information to Telekenex in order to facilitate Defendants' schemes.

141.    January 29, 2009.  On January 29, 2009, using stolen confidential Straitshot customer information, Radford and Prudell, in Washington, and Bani, in California, spoke by telephone with Straitshot customer Steen, in Pennsylvania, to solicit Steen to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Steen.

142.    January 29, 2009.  On January 29, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Cascade Coffee and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

143.    January 29, 2009.  On January 29, 2009, using stolen confidential Straitshot customer information, Salazar, in California, e-mailed to Radford and Prudell, in Washington, and Chaney and Zabit, in California, the Telekenex contract for use in soliciting Straitshot customer Ace Hardware.

144.    January 29, 2009.  On January 29, 2009, using stolen confidential Straitshot customer information, Radford and Prudell, in Washington, and Chaney, Zabit and Bani, in California, spoke by telephone with Straitshot customer Evergreen, in Washington, about how Telekenex proposed to move Straitshot's Evergreen network to Telekenex's network.

145.    January 29, 2009.  On January 29, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Carpenters' Trust and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 33
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

146.     January 29, 2009.   On January 29, 2009, Radford, in Washington, e-mailed to Chaney, Zabit and Bani, in California, and Prudell, in Washington a script to be used by Telekenex employees to solicit the Straitshot customers that had been identified as being "fourth tier" by Telekenex.  The script falsely stated that Straitshot was going out of business and that Straitshot's services were being interrupted by the underlying circuit carriers and solicited the Straitshot customers to abandon their contracts with Straitshot and sign on with Telekenex at the same prices Straitshot was charging the customers.  Bani circulated the script to Telekenex salespeople Aaron Kanahale, Tim Healy, Lorenzo Henderson, Leonard Williams, Dominick Nivoli, Benjamin Jones, Jon Rief, and Oscar Molnar, each of whom used the script along with stolen confidential information about Straitshot's customers provided by Prudell and Radford to solicit Straitshot's customers to abandon their contracts with Straitshot and sign on with Telekenex.  On January 30, 2009, Prudell, in Washington, e-mailed each of these Telekenex salespeople, in California, to wish them "happy hunting."

147.     January 29, 2009.   On January 29, 2009, using stolen confidential Straitshot customer information, Chaney, in California, e-mailed Straitshot customer Evergreen, in Washington, to explain the terms of the proposed Telekenex contract.

148.     Straitshot Forwards Employment Contracts to Telekenex.   On January 30, 2009, per the request of Telekenex, Straitshot forwarded to Telekenex copies of the signed Prudell and Radford Employment Contracts.

149.     January 30, 2009.   On January 30, 2009, while Mammoth was under contract with Straitshot, Zabit, in California, e-mailed Worthen, in Wyoming:  "We have now hired all of the straitshot engineers.  Are you able to get together on a call?"

150.     January 30, 2009.   On January 30, 2009, Prudell e-mailed Straitshot customer Evergreen, Summers, who continued to be a Straitshot employee, and the former Straitshot engineers and informed Evergreen that Telekenex had "set up a toll free number that will get you to your previous engineers" from Straitshot.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 34
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

151.    <u>January 30, 2009.</u>  On January 30, 2009, a representative of Straitshot customer Alpha Packaging, in New York, e-mailed Straitshot as follows:  "Are you guys in trouble as we have some other company calling us saying the circuits are being turned off because Straitshot is out of business."  Alpha Packaging confirmed that the company that had made the false representations about Straitshot was Telekenex.

152.    <u>January 30, 2009.</u>  On January 30, 2009, Straitshot customer Stellar Recovery, Inc. reported to Straitshot that:

> I've just been contacted by Lenny Williams from Telekenex …. He indicated that Straitshot is in some extreme financial trouble right now and Straitshot customers are in jeopardy of their circuits with underlying carriers being disconnected due to non payment.  I'm trying to validate these claims and make appropriate decisions to prevent our remote offices from disruption in service.

In a follow-up e-mail, a Stellar Recovery, Inc. representative wrote:  "I … have a GREAT concern over unethical practices of your x-employees.  I don't know who to believe.  Put yourself in my position."

153.    <u>January 30, 2009.</u>  On January 30, 2009, using confidential Straitshot customer information supplied by Prudell and Radford and the script drafted by Radford, Telekenex salesman Oscar Molnar, in California, called Straitshot customer Sound Oral & Maxillofacial ("Sound Oral"), in Washington, and falsely stated that Straitshot was going out of business and solicited Sound Oral to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Sound Oral.

154.    <u>January 30, 2009.</u>  On January 30, 2009, using stolen confidential Straitshot customer information supplied by Prudell and Radford and the script drafted by Radford, Telekenex salesman Aaron Kanahale called Straitshot customer Kruger Bensen Ziemer Architects, Inc. ("KBZ") and falsely stated that Straitshot was going out of business and solicited KBZ to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging KBZ.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 35
CASE NO. C10-268 TSZ

155.     January 30, 2009.   On January 30, 2009, using stolen confidential Straitshot customer information supplied by Prudell and Radford and the script drafted by Radford, Telekenex salesman Leonard Williams called Straitshot customer Trumark Companies and falsely stated that Straitshot was going out of business and solicited Trumark Companies to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Trumark Companies.

156.     January 30, 2009.   On January 30, 2009, using stolen confidential Straitshot customer information supplied by Prudell and Radford and the script drafted by Radford, Telekenex salesman Oscar Molnar, in California, called Straitshot customer Pacific Bag, in Washington, and falsely stated that Straitshot was going out of business and solicited Pacific Bag to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Pacific Bag.

157.     January 30, 2009.   On January 30, 2009, using stolen confidential Straitshot customer information supplied by Prudell and Radford and the script drafted by Radford, Telekenex salesman Leonard Williams, in California, called Straitshot customer San Juan Navigation, in Washington, and falsely stated that Straitshot was going out of business and solicited San Juan Navigation to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging San Juan Navigation.

158.     January 30, 2009.   On January 30, 2009, using stolen confidential Straitshot customer information supplied by Prudell and Radford and the script drafted by Radford, Telekenex salesman Jon Rief called Straitshot customer Chaser Aerodynamics, LLC ("Chaser") and falsely stated that Straitshot was going out of business and solicited Chaser to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Chaser.

159.     January 30, 2009.   On January 30, 2009, using stolen confidential Straitshot customer information supplied by Prudell and Radford and the script drafted by Radford,

FOURTH AMENDED COMPLAINT FOR DAMAGES - 36
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Telekenex salesman Tim Healy, in California, called Straitshot customer Alpha Packaging, in New York, and falsely stated that Straitshot was going out of business and solicited Alpha Packaging to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Alpha Packaging.

160.   <u>January 30, 2009.</u>  On January 30, 2009, using stolen confidential Straitshot customer information, Radford, in Washington, spoke by telephone with CMS Enterprises, in Oregon, and USB, in Washington, and falsely stated that Straitshot was going out of business and solicited USB to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging USB.

161.   <u>January 30, 2009.</u>  On January 30, 2009, while he was a Straitshot employee, Summers, in Washington, e-mailed to the Telekenex engineers, in California, that he would be the engineer on duty for Telekenex managing the "transition" of Straitshot customers to Telekenex.

162.   <u>January 31, 2009.</u>  On January 31, 2009, while he was a Straitshot employee, Summers, in Washington, e-mailed to Zabit and Telekenex employee Charles Hampton, in California, that Summers was creating spreadsheets showing how Telekenex would technically accomplish the movement of the Straitshot customers from the Straitshot network to Telekenex's network.  Summers used stolen Straitshot spreadsheets containing confidential information about Straitshot customer networks to create the spreadsheets that Telekenex used to plan for, and accomplish, the movement of Straitshot customers from Straitshot's network to Telekenex's network.

163.   <u>Straitshot Contracts with Voxitas to Refer Straitshot Customers.</u>  As a result of the actions taken by Mammoth and Telekenex, Straitshot's goodwill among its customers was severely damaged.  To mitigate damages to its customers and to itself, Straitshot contracted with another managed network services provider, Voxitas, to refer Straitshot's customers to Voxitas. In exchange for each successful referral, Voxitas would pay Straitshot a residual commission on

ongoing revenues received from the referred customers.  Mr. Gold advised Worthen of this agreement.

FEBRUARY 2009

164.   <u>Mammoth Refuses to Abide by the Deferral Agreement</u>.  Contrary to the Deferral Agreement, on February 2, 2009, Worthen e-mailed Mr. Gold and demanded that Straitshot pre-pay by February 13, 2009 $30,000 of the as-yet-unissued February 27, 2009 Mammoth invoice.  Mammoth advised Telekenex of this demand.

165.   <u>February 2, 2009.</u>  On or about February 2, 2009, using stolen confidential Straitshot customer information, Prudell, in Washington, called Straitshot customer Ace Hardware, in Hawaii, and falsely stated that Straitshot was going out of business, and solicited Ace Hardware to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Ace Hardware.  That day, Prudell e-mailed the proposed Telekenex contract and requested that Ace Hardware execute it.

166.   <u>February 2, 2009.</u>  On February 2, 2009, while he was a Straitshot employee and using stolen confidential Straitshot customer information, Summers communicated with Straitshot customer PSG to manage the technical transition of PSG's Straitshot network to Telekenex's network.  He sought to avoid involving Prudell in that process to allow Prudell to focus on his latest role in Defendants' schemes – specifically, to "dial for dollars" by soliciting other Straitshot customers to abandon their contracts with Straitshot and execute service contracts with Telekenex.  Using Straitshot's confidential password and log on protocols, but without authorization from or notice to Straitshot, Summers logged in to Straitshot's routers and made changes to Straitshot's network for PSG.

167.   <u>February 2, 2009.</u>  On February 2, 2009, using stolen confidential Straitshot customer information, Bani, in California, and Prudell and Radford, in Washington, spoke by telephone with Straitshot customer Evergreen, in Washington, regarding moving Evergreen off Straitshot's network and on to Telekenex's network.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 38
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

168.   February 2, 2009.   On February 2, 2009, using stolen confidential Straitshot customer information, Radford and Prudell, in Washington, called Straitshot customer DuCharme McMillen, in Indiana, and left a voicemail message on behalf of Telekenex.  That day, using stolen confidential Straitshot customer information, Radford, in Washington, e-mailed DuCharme McMillen, in Indiana, that Radford "[n]eed[ed] to talk with you about what's going on over at Straitshot and your network.  Please give me a call back as soon as you can to discuss."

169.   February 2, 2009.   On February 2, 2009, using stolen confidential Straitshot customer information, Radford called Straitshot customer The Neurology Center and falsely stated that Straitshot was going out of business and solicited The Neurology Center to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices charged by Straitshot.  As a result, The Neurology Center cancelled its contract with Straitshot.

170.   February 3, 2009.   On February 3, 2009, using stolen confidential Straitshot customer information, Bani and Ciniero, in California, and Prudell and Radford, in Washington, spoke by telephone with Straitshot customer DuCharme McMillen, in Indiana, and falsely stated that Straitshot was going out of business and solicited DuCharme McMillen to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging DuCharme McMillen.

171.   February 3, 2009.   On February 3, 2009, using stolen confidential Straitshot customer information, Bani, in California, and Radford and Prudell, in Washington, spoke by telephone with Straitshot customer The Ram, in Washington, and falsely stated that Straitshot was going out of business and solicited The Ram to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging The Ram.

172.   February 3, 2009.   On February 3, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer

DuCharme McMillen and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

173.   February 3, 2009.  On February 3, 2009, using stolen confidential Straitshot customer information, Radford, in Washington, e-mailed to Straitshot customer DuCharme McMillen, in Indiana, the proposed Telekenex contract.

174.   February 3, 2009.  On February 3, 2009, using stolen confidential Straitshot customer information, Bani and Salazar, in California, and Prudell and Radford, in Washington, spoke by telephone with Straitshot customer Norco, in Idaho, and falsely informed Norco that Straitshot was going out of business and solicited Norco to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Norco.

175.   February 3, 2009.  On February 3, 2009, Straitshot customer KBZ reported to Straitshot as follows:

> It has been a very unsettling week which began with a call from a representative of Telekenex stating that he was working at the behest of Covad (and other carrier [sic]) to pick up the pieces of a defaulted Straitshot and that our circuits could be shut down at any time as Straitshot was significantly behind in payments to carriers. …. They knew our current Straitshot rates and offered to put me in touch with "former Straitshot employees" that had come to Telekenex in the wake of Straitshot's "impending dissolution" (not an exact quote).

176.   February 3, 2009.  On February 3, 2009, Straitshot customer Vinculum Communications reported to Straitshot as follows:

> I did receive a contact from Benjamin Jones [bjones@telekenex.com]…. He contacted me stating that they had purchase [sic] all of your circuits and were going to take over services and would still honor the Straitshot price (but we had to sign a 3 year extension deal)…. I have started looking around to move the circuits because of the notification that Straitshot is going out of business.  Benjamin did offer for me to speak with Mark Radford (our old sales rep from Straitshot) if I needed verification that Straitshot was out of business.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

177.   <u>February 3, 2009.</u>  On February 3, 2009, Straitshot agent Jae Sin reported to Straitshot as follows:  "People from Telekenex are calling our customers stating that you are shutting them off next week Friday and that they can do a[n] internal core routing changes [sic] without changing out the local loop."  Mr. Sin was particularly concerned about the possibility that unauthorized individuals could execute "internal core routing changes," as such modifications involve a process whereby the destination of customer data travelling over the network can be changed.  Such changes would also be required to move a network endpoint to a different carrier network core, as in Defendants' schemes to move customers from Straitshot's network to Telekenex's network.  Absent Straitshot's explicit authorization and direction – Straitshot being the one in control of the highly confidential information regarding the Straitshot network's endpoints – this type of change could not occur without the cooperation of an unscrupulous carrier and the use by Telekenex of confidential Straitshot customer information provided by Prudell, Radford, Summers, and Worthen to breach the security of Straitshot's network configuration.

178.   <u>February 3, 2009.</u>  On February 3, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Perry Ford and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

179.   <u>February 3, 2009.</u>  On or about February 3, 2009, using stolen confidential Straitshot customer information, a Telekenex salesperson called Straitshot customer Miller, Inc. and falsely told Miller Inc. that Straitshot was going out of business and that Miller, Inc.'s network would be disconnected within one week unless Miller, Inc. signed up with Telekenex.

180.   <u>February 3, 2009.</u>  On February 3, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer

FOURTH AMENDED COMPLAINT FOR DAMAGES - 41
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Vision Express and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

181.   February 3, 2009.  On February 3, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer MOR Furniture and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

182.   February 3, 2009.  On February 3, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Howard S. Wright and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

183.   February 4, 2009.  On February 4, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Security RM and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

184.   February 4, 2009.  On February 4, 2009, using stolen confidential Straitshot customer information, Radford e-mailed the agent for Straitshot customer Stellar Recovery/ARS and stated: "As mentioned, we can simply re-point the traffic for customer, ARS, ensuring the least amount of down time possible.  We will not need to re-provision loops or need to role a truck.  Telekenex will honor all the existing SS [Straitshot] pricing."  The reference to "re-point[ing] the traffic" describes a process whereby the destination of network endpoints are shifted to a different carrier network core, as in Defendants' schemes to  move customers from Straitshot's network to Telekenex's network.  Absent Straitshot's explicit authorization and direction– Straitshot being the one in control of the highly confidential information regarding the

Straitshot network's endpoints – this type of change could not occur without the cooperation of an unscrupulous carrier and the use by Telekenex of Straitshot's confidential customer information provided by Prudell, Radford, Summers, and Worthen to breach the security of Straitshot's network configuration.

185.   <u>February 4, 2009.</u>  On February 4, 2009, using stolen confidential Straitshot customer information, Prudell, in Washington, called Straitshot customer DuCharme McMillen, in Indiana, and falsely stated that Straitshot was going out of business and solicited DuCharme McMillen to abandon its contract with Straitshot and sign on with Telekenex at the same prices Straitshot was charging DuCharme McMillen.

186.   <u>February 5, 2009.</u>  On February 5, 2009, using stolen confidential Straitshot customer information, Radford, in Washington, called Straitshot customer Nexus IS, in California, and left a voicemail message falsely stating that Straitshot was going out of business and soliciting Nexus IS to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Nexus IS.

187.   <u>February 5, 2009.</u>  On February 5, 2009, using stolen confidential Straitshot customer information, Radford and Prudell, in Washington, and Bani, in California, spoke by telephone with Straitshot customer DuCharme McMillen and falsely stated that Straitshot was going out of business and solicited DuCharme McMillen to abandon its contract with Straitshot and sign on with Telekenex at the same prices Straitshot was charging DuCharme McMillen.

188.   <u>February 5, 2009.</u>  On February 5, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer IPiphany and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

189.   <u>February 5, 2009.</u>  On February 5, 2009, using stolen confidential Straitshot customer information, Prudell and Radford, in Washington, and Bani, in California, spoke by

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

telephone with Straitshot customer Mega Hertz, in Colorado, and falsely stated that Straitshot was going out of business and solicited Mega Hertz to abandon its contract with Straitshot and sign on with Telekenex at the same prices Straitshot was charging Mega Hertz.

190.   February 5, 2009.  On February 5, 2009, using stolen confidential Straitshot customer information, Radford, in Washington, e-mailed to Straitshot customer DuCharme McMillen, in Indiana, the proposed Telekenex contract.

191.   February 5, 2009.  On February 5, 2009, using stolen confidential Straitshot customer information, Prudell called Straitshot customer Lake Washington Vascular and falsely stated that Straitshot was going out of business and solicited Lake Washington Vascular to abandon its contract with Straitshot and sign on with Telekenex at the same prices Straitshot was charging Lake Washington Vascular.

192.   February 5, 2009.  On February 5, 2009, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Lake Washington Vascular and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

193.   February 5, 2009.  On February 5, 2009, while Summers was a Straitshot employee, Telekenex's Director of IP Infrastructure, Charles Hampton, e-mailed to Zabit, Summers, and other Telekenex engineers that Summers would be accessing Straitshot's routers, requiring use of Straitshot's confidential passwords and log on protocols, to move Straitshot customer Evergreen's network from Straitshot's network to Telekenex's network.  While he was a Straitshot employee, Summers completed the unauthorized reconfiguration described by Hampton.

194.   February 5, 2009.  On February 5, 2009, while he was a Straitshot employee, Summers e-mailed to Zabit, in California, and Prudell, in Washington, stolen confidential Straitshot customer information about Straitshot customer Evergreen that Summers obtained from Straitshot's CRM database.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 44
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

195.   <u>Entry of TRO.</u>  On February 5, 2009, the King County Superior Court entered a TRO against Prudell, Radford and Telekenex prohibiting them from:

> (1) using in any way Straitshot's trade secrets and confidential information, including without limitation, information about Straitshot's customers and its network; (2) Communicating in any way with anyone known by Defendants to be a Straitshot customer, vendor, partner or agent of a Straitshot customer; and (3) Making any statement about the status of Straitshot's business.

196.   <u>February 6, 2009.</u>  On February 6, 2009, Summers advised Straitshot that he would not be doing any more work for Straitshot and that he was relinquishing that day access to Straitshot's confidential passwords.

197.   <u>February 2009.</u>  In early February 2009, without permission from Straitshot and while he was a Straitshot employee, Summers repeatedly logged on to Straitshot's routers, using Straitshot's confidential password and log on protocols, to obtain information regarding Straitshot's customer circuits for use in moving Straitshot customers to Telekenex's network. Summers supplied to Telekenex engineers Straitshot's confidential password and log on protocols which they used to obtain information regarding Straitshot's customer circuits for use in moving Straitshot customers to Telekenex's network.  After February 6, 2009, Summers, on behalf of Telekenex, repeatedly logged on to Straitshot's routers, using Straitshot's confidential password and log on protocols, to make the changes on Straitshot's network necessary for Defendants to accomplish their scheme of moving Straitshot's customers to Telekenex's network without Straitshot's knowledge or consent.

198.   <u>February 6, 2009.</u>  On February 6, 2009, in direct violation of the TRO, Summers, in California, sent an instant message to Worthen, in Wyoming, requesting that Mammoth maintain Straitshot customers on Straitshot's routers while Summers completed the engineering work necessary to move Straitshot customers to Telekenex's network.  While Mammoth was under contract with Straitshot and without notifying Straitshot, Worthen responded that Mammoth would do so.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 45
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

199.   February 6-7, 2009.  While Mammoth was under contract with Straitshot and in direct violation of the TRO, Zabit traveled from California to Wyoming and back on February 6-7, 2009 to meet with Worthen and the Mammoth Board of Directors at Mammoth's offices in Wyoming.  Zabit presented to Worthen and the Mammoth Board a proposal for Mammoth to move all of Straitshot's customers to Telekenex's network without Straitshot's consent in exchange for Telekenex committing to purchase a high volume of circuits from Mammoth.

200.   February 7, 2009.  On February 7, 2009, using stolen confidential Straitshot customer information and in direct violation of the TRO, Telekenex salesman Tim Healy, in California, e-mailed to Straitshot customer Mega Hertz, in Colorado, the proposed Telekenex contract.

201.   February 9, 2009.  On February 9, 2009, using stolen confidential Straitshot customer information and in direct violation of the TRO, Zabit, Bani and Salazar, in California, and Prudell and Radford, in Washington, spoke by telephone regarding soliciting Straitshot's customers to abandon their contracts with Straitshot and sign on with Telekenex at the same prices Straitshot was charging the customers.

202.   February 9, 2009.  On February 9, 2009, in direct violation of the TRO, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer RGL Forensics and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

203.   February 9, 2009.  On February 9, 2009, in direct violation of the TRO, Summers, using stolen Straitshot's confidential password and log on protocols, accessed Straitshot's router and disabled the network for Straitshot customer Norco and caused the network to cease functioning.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

204.   <u>February 10, 2009.</u>  On multiple occasions on February 10, 2009, Telekenex, without authorization from Straitshot and in direct violation of the TRO, used Straitshot's confidential passwords and protocols, obtained from Summers, to log in to Straitshot's routers.

205.   <u>February 10, 2009.</u>  On February 10, 2009, using confidential Straitshot customer information and in direct violation of the TRO, Radford e-mailed to Straitshot customer Lake Washington Vascular the proposed Telekenex contract and requested that Lake Washington Vascular call Telekenex to discuss the same.

206.   <u>February 10, 2009.</u>  On February 10, 2009, in direct violation of the TRO, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Easy Care and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

207.   <u>February 10, 2009.</u>  On February 10, 2009, using confidential Straitshot customer information and in direct violation of the TRO, Bani, in California, spoke by telephone with Straitshot customer A-Dec, in Oregon, and falsely stated that Straitshot was going out of business and solicited A-Dec to abandon its contract with Straitshot and sign on with Telekenex at the same prices Straitshot was charging A-Dec.

208.   <u>February 11, 2009.</u>  On February 11, 2009, while Mammoth was under contract with Straitshot and in direct violation of the TRO, Zabit, in California, e-mailed to Worthen, in Wyoming, executed service orders authorizing Mammoth to make the connections to Telekenex's network for use in moving the Straitshot customers to Telekenex.

209.   <u>February 11, 2009.</u>  On February 11, 2009, using stolen confidential Straitshot customer information and in direct violation of the TRO, Bani, Salazar, and Ciniero, in California, and Prudell and Radford, in Washington, spoke by telephone with Straitshot customer Steen, in Pennsylvania, and falsely stated that Straitshot was going out of business and discussed moving Steen from Straitshot's network to Telekenex's network.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

210.   February 11, 2009.  On February 11, 2009, in direct violation of the TRO, Radford, in Washington, e-mailed to Salazar, Chaney and Zabit, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer RW Smith and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

211.   February 11, 2009.  On February 11, 2009, using stolen confidential Straitshot customer information and in direct violation of the TRO, Bani, in California, and Summers, Prudell, and Radford, in Washington, spoke by telephone with Straitshot customer A-Dec, in Oregon, and falsely stated that Straitshot was going out of business and solicited A-Dec to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging A-Dec.

212.   February 12, 2009.  On February 12, 2009, using stolen confidential Straitshot customer information and in direct violation of the TRO, Prudell spoke by telephone with Straitshot customer Boys and Girls Club and falsely stated that Straitshot was going out of business and solicited Boys and Girls Club to abandon its contract with Straitshot and execute a services contract with Telekenex at the same prices Straitshot was charging Boys and Girls Club. In an attempt to keep hidden his violation of the TRO and his continuing role in Defendants' unlawful schemes, Prudell followed the call with an e-mail asking that Boys and Girls Club "Please keep me off [Straitshot CEO] Andrew [Gold']s Radar and I will give the Boys and Girls Club some great options."

213.   February 12, 2009.  On February 12, 2009, in direct violation of the TRO, Holst, in California, e-mailed to Radford, in Washington, and requested that for all of the contracts Telekenex had executed with Straitshot customers:  "I need customer contact information, today if possible, if not, as early tomorrow as possible.  Anthony [Zabit] wants my team to contact all the [former Straitshot] customers tomorrow and obtain Inside Wire information, as well as give them

1   updates on their cut over into our systems." In direct violation of the TRO, Radford supplied the

2   requested stolen confidential Straitshot customer information to Holst.

3       214.   February 13, 2009.  On February 13, 2009, using stolen confidential Straitshot

4   customer information and in direct violation of the TRO, Radford spoke by telephone with

5   Straitshot customer MacKay & Sposito and falsely stated that Straitshot was going out of business

6   and solicited MacKay & Sposito to abandon its contract with Straitshot and execute a services

7   contract with Telekenex at the same prices Straitshot was charging MacKay & Sposito.

8       215.   February 13, 2009.  On February 13, 2009, using stolen confidential Straitshot

9   customer information and in direct violation of the TRO, Radford, in Washington, spoke by

10  telephone with Straitshot customer Chicago Apartment Finders, in Illinois, and falsely stated that

11  Straitshot was going out of business and solicited Chicago Apartment Finders to abandon its

12  contract with Straitshot and execute a services contract with Telekenex at the same prices

13  Straitshot was charging Chicago Apartment Finders.

14      216.   February 17, 2009.  On February 17, 2009, using stolen confidential Straitshot

15  customer information and in direct violation of the TRO, Zabit and Bani, in California, and

16  Prudell and Radford, in Washington, spoke by telephone with Straitshot customer DuCharme

17  McMillen, in Indiana, and solicited DuCharme McMillen to abandon its contract with Straitshot

18  and sign on with Telekenex at the same prices Straitshot was charging DuCharme McMillen.

19      217.   Mammoth Terminates Services to Straitshot.  On February 17, 2009, Mammoth cut

20  off Straitshot's circuits in an effort to extort a premature cash payment from Straitshot contrary to

21  the Deferral Agreement.  This caused the networks of Straitshot's customers to go down and

22  caused damages and distress to those customers and to Straitshot.

23      218.   February 18, 2009.  On February 18, 2009, while Mammoth was under contract

24  with Straitshot and in direct violation of the TRO, Prudell, in Washington, sent an instant message

25  to Worthen, in Wyoming, stating:  "we would like to send $ to you & have a deal done."

26

FOURTH AMENDED COMPLAINT FOR DAMAGES - 49
CASE NO. C10-268 TSZ

219.    <u>February 18, 2009.</u>  On February 18, 2009, while Mammoth was under contract with Straitshot, Worthen, in Wyoming, sent an instant message to Summers, in Washington, advising that the cross-connect between Telekenex's network and Mammoth's network was complete.

220.    <u>Amended TRO</u>.  On February 18, 2009, the King County Superior Court amended the TRO to prohibit Prudell, Radford and Telekenex from:  "(1) using in any way Straitshot's trade secrets and confidential information, including without limitation, information about Straitshot's customers and its network; (2) Communicating in any way with anyone known by Defendants to be a Straitshot customer, vendor, partner or agent of a Straitshot customer" except that Defendants were permitted to communicate with 15 specified customers with whom Prudell and Radford alleged they had substantial customer relationships prior to their employment with Straitshot; "and (3) Making any disparaging statement about the status of Straitshot's business."

221.    <u>February 19, 2009</u>.  On February 19, 2009, former Straitshot engineer Sunil Modi, now employed by Telekenex, provided to Telekenex in direct violation of the Amended TRO the stolen confidential and proprietary Internet Protocol addresses belonging to Straitshot that had been used by Straitshot to create a network for Straitshot customer The Ram.  In direct violation of the Amended TRO, Telekenex and Mammoth used this information to move The Ram from Straitshot's network to Telekenex's network without Straitshot's approval.

222.    <u>February 19, 2009.</u>  On February 19, 2009, while Mammoth was under contract with Straitshot, Worthen, in Wyoming, e-mailed Prudell, in Washington, instructing Telekenex to send over Telekenex contracts signed by the former Straitshot customers.  "I can redirect to you any time once I have that.  We will then send you agreements for all the [Straitshot] circuits you are assuming control of."

223.    <u>February 19, 2009.</u>  On February 19, 2009, using stolen confidential Straitshot customer information, while Mammoth remained under contract with Straitshot, and in direct violation of the Amended TRO, Chaney, in California, e-mailed to Worthen, in Wyoming,

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Telekenex contracts signed by the Straitshot customers.  "Attached are signed contracts for the following companies:  Velocity Express, Evergreen Healthcare, Puget Sound Gas, RAM Restaurants, US Bearings, Miller Inc.  We expect to be sending over the following contracts later today or tomorrow morning as well: Presidential Pools, Shred IT, Boys and Girls Club."

224.    <u>February 19, 2009</u>.  On February 19, 2009, while Mammoth remained under contract with Straitshot, Worthen, in Wyoming, e-mailed to Chaney, in California:  "Nicely done. I'll await your direction to either (1) leave live to the Straitshot router or (2) repoint to your router. As far as I'm concerned, you are in the driver's seat for the first 6 End Users as of 6:00 pm Mountain 2/19/09."  Worthen had no authorization from Straitshot to, and did not inform Straitshot regarding his, offer to put Telekenex in the "driver's seat" of Straitshot's router.

225.    <u>February 19, 2009</u>.  On February 19, 2009, Radford, in Washington, in direct violation of the Amended TRO, e-mailed to Salazar, Chaney, Zabit, Ciniero, and Bani, in California, and Prudell, in Washington, a stolen Straitshot spreadsheet containing confidential information about Straitshot's network for Straitshot customer Organic to Go and asked Salazar to prepare a Telekenex contract for the services outlined in the Straitshot spreadsheet.

226.    <u>February 20, 2009</u>.  Mammoth terminated its contract with Straitshot on February 20, 2009.

227.    <u>February 20, 2009</u>.  On February 20, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Radford and Prudell, in Washington, and Zabit and Bani, in California, spoke by telephone with Straitshot customer Steen, in Pennsylvania, and solicited Steen to abandon its contract with Straitshot and sign on with Telekenex at the same prices Straitshot was charging Steen.

228.    <u>February 20, 2009</u>.  On February 20, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Radford and Prudell, in Washington, and Bani, in California, spoke by telephone with Straitshot customer Pacific Housing Advisors and solicited Pacific Housing Advisors to abandon its contract with Straitshot and sign

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

on with Telekenex at the same prices Straitshot was charging Pacific Housing Advisors.  Pacific Housing Advisors was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

229.  <u>February 20, 2009.</u>  On February 20, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Telekenex salesman Tim Healy, in California, called Straitshot customer Sound Sleep Health, in Washington, and informed Sound Sleep Health that Telekenex had gotten the contact information for Sound Sleep Health from a list of Straitshot customers and he solicited Sound Sleep Health to abandon its contract with Straitshot and sign on with Telekenex.  Sound Sleep Health was not among the Straitshot customers excepted from the Amended TRO's prohibition on contract.

230.  <u>February 20, 2009.</u>  On February 20, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Telekenex salesman Oscar Molnar, in California, called Straitshot customer EWS, in Idaho, and solicited EWS to abandon its contract with Straitshot and sign on with Telekenex.  EWS was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

231.  <u>February 20, 2009.</u>  On February 20, 2009, using stolen confidential Straitshot customer information in direct violation of the Amended TRO, Telekenex salesman Tim Healy, in California, e-mailed Straitshot customer Sound Sleep Health, in Washington, and stated:

> As you are aware, there are serious issues at Straitshot Communications and many of their customers are in danger of being turned off, if they haven't already.  We have entered into agreements with Mammoth Networks who provides a number of services to vendors such as Straitshot to offer the same services with minimal, or no downtime.  All key Straitshot employees, including their engineers and technicians, are now employed at Telekenex.  This allows us to seamlessly transition current Straightshot [sic] customers to the Telekenex network.  I am working on getting you the proper paperwork to you [sic], so we may get Sound Health [sic] migrated over as soon as possible.

Sound Sleep Health was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 52
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

232.   February 20, 2009.  On February 20, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Radford e-mailed Straitshot customer Organics to Go a proposed Telekenex contract to replace Straitshot's services and that "[a]ll services and prices remain the same as today…. As soon as you can get me this back the better so I can get you in the que [sic] with Josh [Summers] and team and a project manager assigned."  Organics to Go was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

233.   February 20, 2009.  On February 20, 2009, in direct violation of the Amended TRO, Summers, in Washington, e-mailed to Mammoth engineer Jeremy Mali, in Wyoming, Straitshot's stolen confidential information about the mapping of Straitshot's customer routes for Mammoth's use in moving Straitshot's customers to Telekenex's network.

234.   February 23, 2009.  On February 23, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Radford, in Washington, and Bani, in California, spoke by telephone with Straitshot customer Easy Staffing, in Arizona, and solicited Easy Staffing to sign on with Telekenex at the same prices Straitshot was charging Easy Staffing.  Easy Staffing was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

235.   February 24, 2009.  On February 24, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, a Telekenex salesperson called Straitshot customer Volunteers of America and solicited Volunteers of America to sign on with Telekenex at the same prices Straitshot was charging Volunteers of America.  Volunteers of America was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

236.   February 27, 2009.  On February 27, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Prudell e-mailed Straitshot customer Boys and Girls Club and solicited Boys and Girls Club to sign on with Telekenex.  Boys

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   and Girls Club was not among the Straitshot customers excepted from the Amended TRO's

2   prohibition on contact.

3       237.   <u>February 27, 2009.</u>  On February 27, 2009, using stolen confidential Straitshot

4   customer information and in direct violation of the Amended TRO, Radford, Prudell and

5   Summers, in Washington, and Ciniero, in California, spoke by telephone with Straitshot customer

6   Pacific Housing Advisors, in Washington, regarding moving Pacific Housing Advisors from

7   Straitshot's network to Telekenex's network.  Pacific Housing Advisors was not among the

8   Straitshot customers excepted from the Amended TRO's prohibition on contact.

9                                       <u>MARCH 2009</u>

10      238.   <u>March 2, 2009.</u>  On March 2, 2009, using stolen confidential Straitshot customer

11  information and in direct violation of the Amended TRO, Radford, in Washington, e-mailed

12  Rogers Machinery, in Oregon, and solicited Rogers Machinery to move from Straitshot's network

13  to Telekenex's network.  Rogers Machinery was not among the Straitshot customers excepted

14  from the Amended TRO's prohibition on contact.

15      239.   <u>March 2, 2009.</u>  On March 2, 2009, using stolen confidential Straitshot customer

16  information and in direct violation of the Amended TRO, Prudell called Organics to Go and

17  solicited Organics to Go to move from Straitshot's network to Telekenex's network.  Organics to

18  Go was not among the Straitshot customers excepted from the Amended TRO's prohibition on

19  contact.

20      240.   <u>March 2, 2009.</u>  On March 2, 2009, using stolen confidential Straitshot customer

21  information and in direct violation of the Amended TRO, Prudell e-mailed Lake Washington

22  Vascular and solicited Lake Washington Vascular to move from Straitshot's network to

23  Telekenex's network.  Lake Washington Vascular was not among the Straitshot customers

24  excepted from the Amended TRO's prohibition on contact.

25      241.   <u>March 3, 2009.</u>  On March 3, 2009, using stolen confidential Straitshot customer

26  information and in direct violation of the Amended TRO, Prudell, in Washington, e-mailed Rogers

Machinery, in Oregon, and solicited Rogers Machinery to move from Straitshot's network to Telekenex's network.  Rogers Machinery was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

242.   <u>March 4, 2009</u>.  On March 4, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Prudell and Radford, in Washington, and Bani, in California, spoke by telephone with Organics to Go and solicited Organics to Go to move from Straitshot's network to Telekenex's network.  Organics to Go was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

243.   <u>March 12, 2009.</u>  On March 12, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Prudell e-mailed Boys and Girls Club and solicited Boys and Girls Club to move to Telekenex's network.  Boys and Girls Club was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

244.   <u>March 13, 2009.</u>  On March 13, 2009, using stolen confidential Straitshot customer information and in direct violation of the Amended TRO, Summers, Prudell and Radford, in Washington, spoke by telephone with Zabit and Ciniero, in California, to plan the solicitation of Pacific Housing Advisors to move to Telekenex's network.  Pacific Housing Advisors was not among the Straitshot customers excepted from the Amended TRO's prohibition on contact.

245.   <u>March 23, 2009.</u>  On March 23, 2009, using stolen confidential Straitshot customer information, Prudell e-mailed Boys and Girls Club and solicited Boys and Girls Club to move to Telekenex's network.

<u>APRIL 2009 AND BEYOND</u>

246.   Even after Straitshot terminated its service, Defendants continued to solicit former Straitshot customers using confidential and proprietary business information from Straitshot.  For example, on April 6, 2009, Mark Radford emailed U.S. Bearings, a former Straitshot customer, seeking to solicit its business.  In May 2009, Zabit and either Purdell or Radford solicited U.S. Bearings to purchase Voice over Internet Protocol (VoIP) service from Telekenex.  At the time,

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Defendants were in possession of confidential proprietary information from Straitshot regarding U.S. Bearings and used that information to solicit business from U.S. Bearings.

247.     On September 10, 2009, Lorenzo Henderson of Telekenex e-mailed Puget Sound Gastroenterology, a former Straitshot customer, to solicit its business using confidential Straitshot business information: "our records indicate the original CPE at this site was sold through Straitshot and is out of warranty.  I am working on getting pricing for replacement CPE ASAP."

248.     On December 10, 2009, Tom Hunsinger of Telekenex e-mailed Greg Bronemann of Howard S Wright, a former Straitshot customer, and solicited Howard S. Wright's business using confidential Straitshot business information: "Happy Holidays!  I wanted to reach out and introduce Telekenex.  We are a national provider of voice and data solutions and wanted to see if there are technology initiatives underway that we could participate in?  We provide MPLS WAN, Internet Access, Universal Threat Protection, and hosted Cisco Telephony.  Are you in the market for any these types of services? Our customers include 7UP, Disney, The Oakland Raiders, Gymboree, Evergreen Healthcare and many more. Please visit our website at www.telekenex.com and give me a call at 972-535-7752."

<u>SUMMERS' OBSTRUCTION OF JUSTICE</u>

249.     Defendant Summers made a long series of false statements to cover up Defendants' wrongdoing.  On February 7, 2009, Summers sent Straitshot CEO Andrew Gold an email at 12:33 p.m. stating: "The only property of Straitshot that I retain is access to the network which, after this email, I will have terminated entirely."  In fact, that was untrue, as he still maintained *at least* the Straitshot laptop.

250.     On February 11, 2009, Straitshot CFO Phil Howe sent Summers an instant message instructing him to return all Straitshot equipment and property in his possession.  According to Howe:  "I told him that we needed to get all the Straitshot equipment and property back that he had at his apartment.  That night we met up at the Bel Red Storage facility at about 8:00PM.  He had rented a van.  He told me that he had 'all the stuff from my apartment.'  The items consisted

of about 10 flat panel monitors, 4 loose computers 'CPUS' and assorted routers returned from customers and other boxes and equipment.  Near the end of the unloading I asked him if the loose computers were all the computers he had.  He said yes.  I asked him where Ashlie Young's computer was.  He told me that it and all other unused computers were in the downtown storage locker.  I did not specifically ask him about his Dell M-series laptop computer."  The "Dell M-series laptop computer" Mr. Howe mentions refers to the primary computer Summers used as Straitshot's Director of Engineering (the "Summers Straitshot Laptop").

251.    On February 13, after the Second Temporary Restraining Order was served on him, Summers called Howe to say that the Summers Straitshot Laptop was in the Bel-Red storage locker.  According to Howe, "I told him that I had not seen it and that we had not talked about it specifically.  He then said it must have been in a box.  I told him that I would go back and check the locker to be sure."   Howe later checked and could not find the Summers Straitshot Laptop in question.

252.    On February 16, Summers filed a declaration stating under oath:  "On February 12, 2009, I met with Straitshot CFO Phil Howe and provided him with all the hardware that former Straitshot employees had in their possession, including the laptop Mr. Gold claims is still in my possession [referring to the Summers Straitshot Laptop]."  That declaration was false and was intended to obstruct the then pending state-court proceeding.

253.    In fact, Summers was continuing to use the Summers Straitshot Laptop.  On February 14, Summers connected the Summers Straitshot Laptop to a CD-ROM containing the file "Engineering Contacts."  On February 16, the same day he swore under oath that the Summers Straitshot Laptop had been returned, Summers loaded a new operating system - Microsoft Windows Vista - over the existing operating system on the computer (Windows XP).  Plaintiff's expert Erik Laykin has opined that the installation of Windows Vista was "highly unusual" in light of the pending litigation, and he could not offer "a valid or compelling technical reason for the installation."  Laykin added: "However, I have observed that technically sophisticated users who

FOURTH AMENDED COMPLAINT FOR DAMAGES - 57
CASE NO. C10-268 TSZ

wish to wipe or delete as much information as possible on a computer without using a wiping software utility (which will leave a pattern or signature on the hard drive) may instead install a new operating system knowing that the net result will be the overwriting of significant portions of the unallocated space on the hard drive further removing the possibility of reconstructing overwritten files." Summers' loading of a new operating system on the Summers Straitshot Laptop was intended to obstruct the pending state-court proceeding.

254. Also on the same day he swore the Summers Straitshot Laptop had been returned, Summers used the Mozilla Firefox web browser software on the laptop - at 3:05:30 p.m. and then again at 5:42:43 p.m.

255. On February 17, Summers created a new folder, labeled "Telekenex," on the Summers Straitshot Laptop, and placed 28 files in it. The folder included files containing confidential Straitshot business information, as well as files relating to Defendants' scheme for moving Straitshot customers to Telekenex, including files with the titles "Carrier Mappings," "Transition Plan," and "Telekenex Transition Team Script."

256. That same day – February 17, 2009 – Phil Howe sent Summers an email at 3:22 p.m. stating: "I didn't find it [the Summers Straitshot Laptop] in the boxes that you delivered to the storage unit."

257. At 7:16 p.m., Summers responded: "Was everything else there? If so, I will check around to make sure it didn't get missed from my house."

258. At 7:39 p.m., Howe replied to Summers: "All I found were those three that were together (one without the keys – Toms – one without the battery – one that when booted up said test). I looked in all the boxes. I have the little one that was Andrews."

259. Summers nevertheless still failed to return the Summers Straitshot Laptop.

260. The next day, on February 18, Straitshot obtained another state-court TRO (the "Amended 2nd TRO") "requiring Summers to make a diligent search for and produce the Straitshot laptop in his possession…. Defendants are on notice that strict compliance with this

Order is required.  If evidence of tempering or altering of property subject to this Order is found or observed by Plaintiff in the course of discovery in this matter, the Court will impose monetary sanctions and impose adverse evidentiary inference sanctions based upon spoliation of evidence."

261.     Summers still failed to return the Summers Straitshot Laptop.  In fact, on February 19, one day after the Amended 2nd TRO was served on Summers, he deleted 10 Excel files on the laptop.   On February 24, he ran a program, known as "RegEdit," designed to delete data on the computer.   Laykin found that this operation "permanently destroyed or modified all records and evidence of external devices (hard drives, thumb drives, etc) attached to the computer, records of deleted files and numerous other user-induced activity."  The deletion of files and running of the RegEdit program were intended to obstruct the pending state-court proceeding.

262.     On February 28, Summers used the Summers Straitshot Laptop to connect to an outside network containing a folder labeled "Strait Shot Transitions."  On March 2, he created a file in the "Telekenex" folder on the Summers Straitshot Laptop named "Customer Issues."  On March 4, he accessed the Telekenex folder on the Summers Straitshot Laptop (now containing 50 files) for the last time.  On March 5, he shut down the Summers Straitshot Laptop for the last time.

263.     On March 9, Summers sent a text message to Straitshot CFO Phil Howe: "I finally went through all my closet and found the laptop bag behind a box.  I can meet you tomorrow morning to give it to you?"  Howe replied: "I am leaving for the airport early.  Please give it to our attorney."  On March 13, Summers delivered the Summers Straitshot Laptop to Straitshot's attorney.

264.     On March 18, 2009, the King County Superior Court issued an Order on Straitshot's Motion for Contempt: "[T]he court finds that Defendants have not complied with all aspects of the court's prior orders as follows:  1)  Defendants failed to timely deliver the laptop in Mr. Summer's [sic] possession which violated the Second Amended Temporary Restraining Order issued on February 18, 2009 ….  Because Plaintiff's acknowledge that the harm sought to be prevented by restraining orders has occurred and that the case is now one about damages, the court

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

reserves ruling on the sanctions.  In accordance with prior orders, the court may impose monetary sanctions after hearing further evidence or impose adverse evidentiary inferences."

265.    At a deposition on August 3, 2009, prior to the removal of this case from the Superior Court of King County, Summers testified under oath.  Among other things, he denied using the Summers Straitshot Laptop for Telekenex activities once he began working at Telekenex.  He denied accessing any of the data relating to Straitshot customers or the design of the Straitshot network, once he began working at Telekenex.   He stated that he could not recall using the Summers Straitshot Laptop once he began working at Telekenex.  He could not recall even turning it on.

266.    In fact, during the very time Summers denied at his deposition even possessing the Summers Straitshot Laptop, or turning it on, he was repeatedly using it to implement Defendants' scheme to steal Straitshot's confidential business information and move Straitshot customers to the Telekenex network.

267.    At a deposition in this case on November 16, 2010, Summers again testified that under oath.  This time he claimed that he mistakenly thought he had been using a Telekenex machine when he was in fact working on his former Straitshot laptop.  This testimony contradicted his previous deposition testimony of August 3, 2009 and could not explain why he had deliberately erased files on the laptop, why he installed a new operating system to wipe out existing data, and why he ran the "RegEdit" program to cover up his wrongdoing.

268.    Summers' February 16, 2009 declaration under oath, his August 3, 2009 testimony under oath at his deposition, and his November 16, 2010 testimony under oath at his deposition all occurred in the context of pending judicial proceedings, and in all three instances Summers had the intent of interfering with the due administration of justice by providing false testimony.  Further, the testimony was closely related to the subject of the pending proceedings.

269.    <u>Misappropriation and Use of Trade Secrets and Confidential Information.</u>  Defendants misappropriated and used and continue to misappropriate and use Straitshot's trade

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

1    secrets and confidential customer information.  Defendants continue to provide services to

2    Straitshot's customers and continue to solicit Straitshot's customers using confidential trade

3    secrets and confidential customer information stolen from Straitshot.

4         270.   <u>Impact on Straitshot Customers</u>.  Straitshot customers, as well as Straitshot itself,

5    suffered injury as a proximate result of Defendants' actions.  The harm to Straitshot customers

6    was an inherent part of the Defendants' fraudulent scheme.  Customers such as U.S. Bearings have

7    stated that the service that they received from Telekenex was inferior to the service they received

8    from Straitshot.  Further, Defendants' pressured customers into signing contracts with Telekenex,

9    without affording customers the opportunity to consider other options for telecommunications

10   services, because Telekenex pressured Straitshot's customers and represented that Telekenex was

11   the sole alternative to risking a major interruption of their phone, data, and Internet services.

12   Customers such as U.S. Bearings were forced into longer-term contracts with Telekenex than they

13   otherwise would have preferred.  In addition, customers were forced into Telekenex contracts

14   containing termination fees and other provisions less favorable than their agreements with

15   Straitshot had been.  All of these impacts represented harm to former Straitshot customers.

16                          <u>SIMILAR RACKETEERING SCHEMES</u>

17        271.   Defendants engaged in racketeering schemes against other parties in addition to

18   Straitshot and looked for other opportunities to force businesses to become Telekenex customers

19   under duress.  In March 2009, former Straitshot employee Tom Hunsinger, then an employee of

20   AuBeta Network Corporation ("AuBeta"), advised Prudell that "there was another Straitshot going

21   on" at AuBeta which, like Straitshot, was a managed services provider in Washington State.  On

22   March 27, 2009, Telekenex IXC, Inc. issued a press release stating that it had acquired AuBeta via

23   an Asset Purchase Agreement.

24        272.   Charlotte Russe, Inc. ("Charlotte"), a California company, had signed a multi-year

25   agreement in 2004 with AuBeta, which was contractually scheduled to change to a month-to-

26   month obligation on April 1, 2009.  On March 27, 2009, Durbhakula and Chuck Vondra, on behalf

FOURTH AMENDED COMPLAINT FOR DAMAGES - 61
CASE NO. C10-268 TSZ

of Charlotte, had a telephone conference with Hunsinger and Chaney, CEO of Telekenex and Telekenex IXC.  Chaney repeated the threat that services to Charlotte would be disconnected if it did not sign a multi-year contract by the end of the day.  Durbhakula and Vondra pointed out that Charlotte had negotiated with AuBeta to have the agreement become month-to-month in a matter of days and that, since Telekenex was acquiring AuBeta's assets and contractual obligations, it should also be required to continue to provide uninterrupted services without requiring that Charlotte forego the agreed month-to-month arrangement and enter into a new long-term agreement with Telekenex.  But Chaney claimed that, under Telekenex's Asset Purchase Agreement with AuBeta, Telekenex was assuming AuBeta's contractual liabilities only to customers who had agreed to a long-term commitment to Telekenex.  Chaney falsely stated that AuBeta was not assigning to Telekenex IXC, and Telekenex IXC was not assuming, AuBeta's contractual obligations and liabilities to Charlotte and that Telekenex IXC had no obligation to continue to provide services to Charlotte, unless it executed the proposed contract amendment with Telekenex.

273.    On March 30, Chaney emailed Durbhakula to say that the agreement was required to be "executed today or your service could be disconnected by the underlying carriers."

274.    The statements of Telekenex and Telekenex IXC, communicated by wires in interstate commerce, were false and misleading in violation of 18 U.S.C. § 1343.  In fact, pursuant to Telekenex IXC's agreement with AuBeta, AuBeta assigned to Telekenex IXC, and Telekenex IXC assumed, AuBeta's contractual obligations and liabilities to Charlotte.  Telekenex IXC thus had an existing contractual obligation to continue to provide services to Charlotte, regardless of any contract amendment or other agreement directly between Charlotte and Telekenex and/or Telekenex IXC.  Further, Telekenex IXC was required to pay any accounts payable to the underlying carriers, rather than using those accounts payable as an excuse to threaten to discontinue Charlotte's services.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

275.     Telekenex and Telekenex IXC never disclosed to Charlotte that the Asset Purchase Agreement provides that Telekenex IXC "hereby assumes, and [AuBeta] hereby assigns to [Telekenex IXC], [the] (a) obligations and liabilities of [AuBeta] under customer and vendor contracts relating to the Business [of providing and servicing wide area managed networks] . . . and (b) accounts payable relating to the Business . . . ."  Nor did Telekenex and Telekenex IXC disclose that Telekenex IXC's assumption of those liabilities was "the sole consideration for the sale, transfer and assignment" of AuBeta's assets.  Instead, Telekenex and Telekenex IXC made affirmative misrepresentations to the contrary.  In particular, Telekenex and Telekenex IXC falsely stated that AuBeta was not assigning to Telekenex IXC, and Telekenex IXC was not assuming, AuBeta's contractual obligations and liabilities to Charlotte, and that Telekenex IXC had no obligation to continue to provide services to Charlotte unless it executed the proposed contract amendment.  Telekenex and Telekenex IXC asserted that Charlotte's service would be disconnected by the underlying carriers, without disclosing Telekenex and Telekenex IXC's own contractual obligation to pay those carriers' accounts payable.

276.     On information and belief, Telekenex and Telekenex IXC knew that they were required to continue providing services to Charlotte, and to pay the underlying carriers as necessary to continue to provide those services, regardless of any contract amendment or other agreement directly between Charlotte and Telekenex and/or Telekenex IXC.   Telekenex and Telekenex IXC acted with the intent of deceiving Charlotte and inducing Charlotte to execute a long-term agreement.  Telekenex and Telekenex IXC knew their representations were false or made them recklessly and without regard for the truth.

277.     Charlotte was unaware of material provisions of Telekenex IXC's Asset Purchase Agreement with AuBeta.  Charlotte signed the long-term agreement with Telekenex IXC under duress and in order to avoid the threatened termination of service.  Charlotte stated to Telekenex: "[We have] an existing agreement with AuBeta, which will believe should be honored.  Despite our multiple requests, no one has explained why this agreement is somehow no longer valid.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 63
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Instead, we have been presented with a demand that we sign up for a long term commitment or service to 185 of our stores will be cut off today. . . . [I]t has been made clear repeatedly that our service would be shut off if we do not sign up to a long term commitment."

278.    Charlotte suffered substantial harm in that it was deprived of the benefit of its bargain with AuBeta and fraudulently induced to enter into an unnecessary, undesirable, and expensive contract amendment with Telekenex and Telekenex IXC.

279.    On June 4, 2009, Charlotte filed suit in California Superior Court for declaratory and injunctive relief against Telekenex IXC.  On June 29, 2009, that court issued a temporary restraining order preventing Telekenex IXC from terminating Charlotte's service.

280.    Meanwhile, on June 11, 2009, Telekenex IXC sued Charlotte in King County Superior Court regarding the same agreement.  Telekenex IXC served a summons and complaint on Charlotte's registered agent, but those documents were lost, and Charlotte failed to answer.  On July 9, Telekenex IXC moved for default, and the motion was granted the same day.  On July 13, Telekenex IXC moved for default judgment, and judgment was entered the next day.  On July 24, Telekenex IXC served five writs of garnishment.  On July 29, Wells Fargo notified Charlotte that it had received a writ of garnishment.  The next day, Charlotte's counsel called Telekenex IXC's counsel to discuss vacating the default judgment and the writ.  Telekenex IXC refused.

281.    Charlotte then moved in court to vacate the default judgment and writs of garnishment.  The trial court refused, but the Court of Appeals ruled on November 15, 2010 that the trial court abused its discretion in refusing to vacate the default judgment.  The Court of Appeals found that Charlotte had stated a valid claim of economic duress: "Charlotte has presented evidence that IXC threatened to allow its service to be cut-off without the notice required in the [agreement] in order to compel Charlotte to enter into a new contract.  Charlotte was first notified of a potential disruption of service on March 25, 2009.  Two days later Chaney and Hunsinger communicated to [Charlotte's vice president of technology] that Charlotte's service would be disrupted unless it agreed to enter into a multi-year extension of its contract.  In an email

from Hunsinger to both Chaney and [the vice president], Hunsinger thanked [the vice president] for his summary of the circumstances that 'Telekenex has made it clear that service will be disconnected to nearly 200 of our stories if we do not sign a 36-month contract today.'  At that time, Charlotte's [agreement] with AuBeta required 60 days written notice before either party could cancel the contract.  The five day notice given by IXC was a violation of the [agreement]. The threatened termination of services would have left 185 Charlotte stores not able to connect to the Internet, connect to the company data center, use the telephone, process customer purchases, track inventory, keep employee timecards, or access company e-mail.  Aside from lost revenue from customer purchases, Charlotte's goodwill and business reputation likely would have suffered as a result of the disconnection of service.  This was sufficient to demonstrate a serious business loss. In order to avoid these serious losses, Charlotte was forced to make a decision to its detriment by entering into a two-year contract extension with IXC."

282.    Telekenex and Telekenex IXC made similar threats against other former AuBeta customers. For example, in April 2009 Telekenex and Telekenex IXC told Restaurant Concepts II, LLC ("RCII"), a Georgia LLC with numerous business locations in King County, Washington, that Telekenex IXC would agree to assume RCII's agreement with AuBeta only if the contract was extended for a period of 36 months.

283.    Prior to its acquisition of AuBeta, Telekenex coerced other customers in a similar way.  For example, in December 2007 Telekenex held hostage Perseus Distribution, Inc. and Perseus Books LLC (collectively, "Perseus"), a California business which had been a Telekenex customer since 2003.  In November 2007, Perseus informed Telekenex that it wished to change telecommunications carriers.  Perseus made this decision because of poor service by Telekenex, including instances of service interruption.

284.    At no time prior to December 14, 2007, the date of the scheduled switch, did Telekenex indicate that it would refuse to comply with Perseus' lawful request.  On December 14, Perseus switched carrier from Telekenex to Telepacific Communications.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

285.     However, on the afternoon of December 14, 2007, Telekenex – for the first time – notified Perseus that it would not release its phone and fax numbers to Telepacific Communications, stating that it intended to demand an "early termination fee" of $120,000. Perseus was unaware of any valid basis for this demand.  Additionally, Perseus understood that, under the Telecommunications Act, even if a fee is owed, Telekenex could not refuse to port the numbers until the fee was paid.

286.     As a result of Telekenex' wrongful refusal, Perseus suffered harm to its business and loss of sales.  When a customer attempted to use any of the Perseus numbers in question, he or she would hear a busy signal.

287.     In January 2008, Perseus sued Telekenex in U.S. District Court for the Northern District of California, alleging violation of the federal Telecommunications Act.

288.     Telekenex and Telekenex IXC perpetrated a similar scheme against Eat 'n Park Hospitality Group, Inc. ("Eat 'n Park"), a Pennsylvania corporation operating over 150 restaurants with 10,000 employees, primarily in Pennsylvania.  AuBeta provided service to Eat 'n Park beginning in 2007.  Telekenex and Telekenex IXC provided no notice to Eat 'n Park of the pending AuBeta acquisition.  Beginning on March 25, 2009, Eat 'n Park began to receive new service agreements on Telekenex forms that were materially different from the terms of its existing contract with AuBeta.  One of the communications stated that the sender "needs the new service agreements authorized and returned by the end of business on Friday [March 27] to avoid a service disruption."

289.     Faced with the threatened termination of its service, Eat 'n Park began exploring new options as well as Telekenex.  Eat 'n Park requested additional information from Telekenex, including its ability to provide a system that was compliant with the VISA Cardholder Information Security Program (CISP).  Telekenex never provided Eat 'n Park with confirmation that its service was CISP compliant.  Eat 'n Park also sent Telekenex a proposed addendum/amendment to the

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

new proposed agreement and a proposed release from AuBeta.  Telekenex never signed or returned these documents to Eat 'n Park.

290.    Instead, on Monday, March 30, 2009, Eat 'n Park received a proposed consent of assignment of its existing contract to Telekenex, conditioned on Eat 'n Park's consent to extend the term of the contract.  At this point, Eat 'n Park was still waiting for much of the information it had requested from Telekenex.  Eat 'n Park did not consent to the conditioned assignment. Nothing in Eat 'n Park's agreement with AuBeta permitted Telekenex to condition a proposed assignment on an extension of the term of the agreement.

291.    Eat 'n Park had no choice but to continue with costly efforts to secure new service while continuing discussions with Telekenex regarding its ability to service Eat 'n Park's account. On April 7, 2009, having not received satisfactory responses from Telekenex, Eat 'n Park delivered a notice of default and termination that formally terminated its prior agreement with AuBeta.  Eat 'n Park incurred significant cost and expense to move off the network, and in April 2009 filed suit against Telekenex and Telekenex, IXC in the Western District of Pennsylvania.

292.    Telekenex perpetrated another fraudulent scheme against Eric F. Anderson, Inc. ("EFA"), a California corporation and licensed general contractor.  On April 9, 2006, EFA entered into a master service agreement with Telekenex for VoIP service but experienced unsatisfactory service, including static, dropped calls, and problems with equipment orders.  In April 2008, continuing to have problems with Telekenex's service, EFA notified Telekenex that it was terminating Telekenex's services and requested that Telekenex "port" its telephone numbers to a new telecommunications service provider, as required by law.

293.    On or about May 28, 2008, EFA received a "Customer Notice of Discontinuance of Service for Non-Payment of Bills" from Telekenex, which stated that EFA's account was paid in full, that "the amount outstanding on your account is now $0.00," but that Telekenex was imposing an early termination fee of $79,431.75.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 67
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

294.    On June 3, 2008, EFA's attorneys sent a letter to Zabit explaining the ongoing problems EFA was experiencing with Telekenex's services, requesting again that Telekenex port EFA's telephone numbers, and explaining that Telekenex's letter and notice of May 28 failed to comply with paragraph 6 of the existing master service agreement, which provided that "[i]n the event of a Telekenex Default, Customer may terminate this Agreement without penalty."

295.    Shortly after EFA's attorneys sent the June 3 letter to Zabit, EFA's chief financial officer, Geza Paulovits, telephoned Zabit.  During their telephone conversation, Zabit apologized for the service problems experienced by EFA, stated that Telekenex was "not going to hold [EFA] hostage," and indicated that he would call CFO Paulovits the following week about porting EFA's telephone numbers.   Zabit never called Paulovits back.

296.    On or about June 24, 2008, EFA received a second "Customer Notice of Discontinuance of Service for Non-Payment of Bills" from Telekenex, which stated that EFA's account was paid in full but that Telekenex was imposing an early termination fee, this time in the amount of $74,136.30.

297.    On June 26, 2008, EFA's attorneys again telephoned Zabit and followed up with a letter restating their position.  Telekenex never responded.  Instead, on July 8, 2008, EFA discovered that Telekenex had disconnected its service, with no warning or notice, and that it could not place or receive phone calls.

298.    On July 9, 2008, EFA sued Telekenex for intentional misrepresentation in the United States District Court for the Northern District of California, alleging that Zabit, on behalf of Telekenex, represented that no early termination fees would be charged to EFA and that Telekenex would port EFA's telephone numbers.  Telekenex's representations were false, and EFA was informed and believes that Zabit either knew his representations were false when he made them or that his representations were made recklessly and without regard to the truth. Telekenex intended that EFA rely on its representations, and EFA did in fact reasonably rely on

FOURTH AMENDED COMPLAINT FOR DAMAGES - 68
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

those representations to its detriment and harm.  EFA asserted that Telekenex's misrepresentations were committed with malice, oppression, and/or fraud, entitling EFA to punitive damages.

299.     Telekenex committed a further series of fraudulent misrepresentations against Dealtree, Inc., a California corporation that operates an Internet retail business for which Internet connectivity is essential.  Dealtree was willing to do business with Telekenex in part because of Telekenex's representations that its Santa Ana facility included fully redundant connections to the Internet.  Specifically, in August 2007, Telekenex made representations orally and in writing to Dealtree concerning the Santa Ana facility, stating that it was a "carrier-neutral facility," that it had "cross-connectivity," and that there were "diverse fiber routes into building."  These representations were important to Dealtree because they meant that, if an Internet connection failed through one carrier, Telekenex would be able to switch to another carrier through its "diverse fiber routes" to minimize down time to Dealtree.  These capabilities were one of the key reasons Dealtree chose to entrust the hosting of its business to Telekenex.

300.     In September 2007, Dealtree and Telekenex entered into a two-year written agreement for Telekenex to provide Internet service and server hosting to Dealtree.

301.     In fact, the representations made by Telekenex to win Dealtree's business were false.  Telekenex's Santa Ana facility was neither carrier-neutral (it was dependent on a single carrier), did not have cross-connectivity, and had no diverse fiber routes (multiple Internet connections) into the facility.

302.     In November 2007 and February 2008, Telekenex's Santa Ana facility suffered catastrophic outages and losses of ability to connect to the Internet, which resulted in all of Dealtree's websites being unavailable for use by customers and clients for many hours.  After suffering these outages, Dealtree notified Telekenex in writing that it needed to remedy the lack of redundancy because it had represented that its facilities were fully redundant.  After receipt of Dealtree's letter, Telekenex's president personally informed Dealtree that the problem of lack of redundancy would be remedied "within days."

FOURTH AMENDED COMPLAINT FOR DAMAGES - 69
CASE NO. C10-268 TSZ

303.     Telekenex did not fix the problem.  Dealtree suffered another catastrophic failure in July 2008 and learned that none of the "fixes" promised by Telekenex had ever been implemented. After the July outage had been ongoing for three hours, Telekenex told Dealtree that it would finally be providing the "diverse fiber routes" it had promised initially by provisioning a "dark fiber" service that normally takes 20 days to activate in "an hour and a half."  When Dealtree checked in again after the "hour and a half" had ended, Telekenex stated that a few more hours would be required but could give no guarantees.

304.     At that point, due to the multiple severe outages suffered by Dealtree and Telekenex's repeated failure to cure the problems, Dealtree pulled most of its servers from the Santa Ana facility and found an alternate provider that could actually provide the services that Telekenex falsely represented it could.  In order to switch hosting providers, Dealtree was required to call in emergency staff and required its employees and contractors to work many hours of overtime.  Dealtree suffered $2,500 in set up fees for the emergency move to the new facilities and lost sales in excess of $200,000.  On September 3, 2008, Dealtree filed suit against Telekenex in the Superior Court of Orange County, California, alleging fraud and deceit.

305.     Telekenex committed similar acts against Bryco Funding, Inc. ("Bryco"), a California mortgage lending company located in San Francisco.  In 2005, Telekenex and Bryco entered into a contract under which Telekenex promised to provide Bryco with reliable and stable Internet connection services, including both data and voice Internet service ("VoIP").  Bryco was induced into entering the contract by the repeated assurances of Telekenex that it would provide reliable and consistent Internet services and, in particular, that the VoIP system would run without trouble, degradation of call quality, or interruption.  Telekenex assured Bryco that the VoIP services it provided were of the same quality as traditional telephone service.  At all times, Bryco was induced and was entitled to rely on Telekenex's representations.

306.     Telekenex materially failed to live up to the terms of the contract throughout its term.  Specifically, Bryco's Internet connection services were unsuccessfully installed and were

FOURTH AMENDED COMPLAINT FOR DAMAGES - 70
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

not fully operational.  Bryco's phone call over the VoIP system were marked by poor quality and in many instances dropped calls that resulted in customer disconnections.  These problems represented a substantial hardship to Bryco, because it was not able to communicate properly with its customers and potential customers.  Beginning in 2006, Bryco documented in written email messages to Telekenex, as well as orally, the numerous and serious problems that Bryco was having.

307.    On or about June 1, 2006, Bryco sent Telekenex written notice stating that it considered Telekenex to be in material breach of the agreement, and that unless the call quality problems were cured immediately, Bryco would consider the agreement to be rescinded, and that it requested Telekenex's cooperation in transitioning Bryco's IT and voice needs to another service provider who would be able to perform the job competently.

308.    Telekenex responded on June 30, 2006 that it was continuing to work on a solution to the call quality and disconnection problems.  However, Bryco continued to have numerous serious problems with customer calls and disconnections.

309.     Consistent with its notice of June 1, 2006, Bryco arranged for the services of another Internet and IT services provider, Telepacific Communications ("Telepacific").

310.    On July 7, 2006, Telekenex sent a letter to Bryco stating that it had received a notice authorizing a change in Bryco's telecommunications carrier from Telekenex to Telepacific. Telekenex alleged that this was a "clear breach" of the 2005 agreement between Bryco and Telekenex and that Bryco was in default under the terms of the agreement.  Telekenex sent a notice that Bryco had failed to pay balances outstanding and demanding $46,715.02 by the close of business on July 12, 2006 (five days' notice).

311.    On July 12, 2006, Bryco's CEO sent an email to Chaney requesting a meeting to discuss the situation.  Chaney did not respond.

312.    On the morning of July 13, 2006, Telekenex disconnected Bryco's service, causing it to lose all of its voice and Internet services.  Bryco's business was completely shut down, and it

was losing thousands of dollars of revenue per hour, as a result of its inability to receive

telecommunications service.  Customers were unable to contact Bryco for important questions

regarding their mortgages, accounts, and other important matters.  Customer loan closings were

jeopardized.

313.    On the morning of July 13, 2006, after shutting down Bryco's service, Zabit sent

Bryco written notice by fax that Telekenex was exercising its rights to terminate the agreement for

default, on five days' notice.  Zabit advised that, to restore service, Bryco would need to pay the

outstanding balance in full, reconnection fees in the amount of $13,400.00, and two months'

deposit, for a total amount of $90,115.02.  Telekenex further advised that it would restore service

only if Bryco signed a new agreement for an additional three-year term and signed a mutual

release of all claims, known and unknown.

314.    The five days' notice and manner of notice of disconnection were completely

inconsistent with the tariffs that Telekenex had filed with the California Public Utilities

Commission, posted on its website, and incorporated into the 2005 agreement with Bryco.  The

legal tariffs required seven days' notice, limited the imposition of reconnection fees, and provided

for credit allowances due to interrupted service.

315.    In a telephone conversation on July 13, 2006, Zabit stated that the tariff "didn't

apply" to the situation, which was a false statement.

316.    Despite Telekenex's wrongful actions, Bryco was faced with no other alternative

but to submit to Telekenex's demands.  Bryco signed both a document entitled "Settlement

Agreement" and a new service agreement provided by Telekenex.

317.    On August 11, 2006, Bryco was finally able to transition its services to another

telecommunications provider.  It was unable to change its provider without substantial interruption

until this earliest available date, and it did make such change with all deliberate haste on such

earliest available date.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 72
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

318.    On September 12, 2006, Bryco sued Telekenex in the Superior Court for the County of San Francisco, alleging rescission, breach of contract, breach of the covenant of good faith and fair dealing, unfair business practices, tortious interference with economic relations, and other causes of action.

319.    Telekenex was also involved in a fraudulent transfer to defeat the ability of Robin Reichert ("Reichert"), a California resident living in San Francisco, to enforce a judgment recovered against Net.World, Inc., a Telekenex successor corporation, and Extension 11.  On January 5, 2005, Reichert commenced an action against Net.World and Extension 11 in San Francisco Superior Court and in 2006 recovered a final judgment in excess of $333,000.  Between approximately November 2001 and March 2007, Net.World and Extension 11 fraudulently transferred their assets, consisting of tangible personal property, ongoing business, accounts receivable, licensing agreements, intellectual property, trademarks, goodwill, and customer contracts, to a group of other companies, including Telekenex.  The transfer of such assets was without consideration of value and was done with actual intent to hinder, delay, and defraud Reichert and other creditors of Net.World and Extension 11.  Reichert did not discover the transfers until January 2007 and thereafter brought suit against Telekenex and other defendants for fraudulent conveyance in San Francisco Superior Court.

320.    When Telekenex IXC, Inc. purchased the assets of AuBeta, Telekenex IXC participated in a scheme to hinder or defraud an AuBeta creditor.  On or about June 7, 2006, AuBeta executed two lease agreements with Michigan Street Buildings, LLC ("Landlord") for a term of 120 months with rent increasing on an annual basis.  Although AuBeta's rent under the leases for January 2009 was $45,000, AuBeta unilaterally, and without Landlord's agreement or consent, paid a reduced rent of $25,000, which was $20,000 less than AuBeta owed.  Subsequently, AuBeta made unilaterally reduced payments of $25,000 in February 2009 and March 2009 and stopped paying rent thereafter.  Landlord informed AuBeta that its failure to pay amounts owed would necessitate Landlord pursuing available remedies for collection, including

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

filing suit.  Landlord sent AuBeta notices of default.  On or about March 27, 2009, Telekenex IXC, Inc. executed an asset purchase agreement under which Telekenex IXC received substantially all of AuBeta's assets, including its cash and cash equivalents, account receivables, customer contracts, intellectual property, hardware and software, servers, computers, and office equipment.   Telekenex IXC knew, or should have known, that the asset sale would delay, hinder, or defraud Landlord's claims.  On August 25, 2010, Landlord filed suit against Telekenex IXC, Inc. in King County Superior Court, alleging fraudulent conveyance and other claims.

321.   <u>Interstate Wire Services</u>.  Defendants used and continue to use interstate wire services to misappropriate and unlawfully use Straitshot's trade secrets and confidential customer information.

322.   <u>Income.</u>  Defendants obtained and continue to obtain income from their pattern of racketeering activity, using interstate wire services to misappropriate and use Straitshot's trade secrets and confidential customer information.  Defendants used and continue to use that income to operate and benefit their enterprise by taking over Straitshot's customers and deriving income from those customers.

323.   <u>Fraudulent transfer of assets.</u>  On information and belief, a fraudulent transfer of assets by Telekenex and Telekenex IXC to IXC, Inc. and IXC Holdings, Inc. occurred in August 2010, involving use of mail and wire communications.

### V.     FIRST CAUSE OF ACTION
### (Breach of Contract against Prudell and Radford)

324.   Straitshot realleges and incorporates herein by reference the allegations contained above.

325.   Prudell and Radford have breached their Straitshot Employment Contracts by using, communicating and divulging Straitshot confidential and proprietary information to and on behalf of Telekenex and Mammoth, by soliciting Straitshot's engineers to leave Straitshot, and by retaining and using Straitshot's confidential customer information.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 74
CASE NO. C10-268 TSZ

326.   Straitshot has suffered damages as a direct result of Prudell's and Radford's breaches of their respective Employment Contracts and is entitled to recover those damages from Prudell and Radford.

## VI.   SECOND CAUSE OF ACTION
### (Interference with Contractual Relations against Telekenex)

327.   Straitshot realleges and incorporates herein by reference the allegations contained above.

328.   Straitshot has valid contractual relationships with Prudell and Radford that continued beyond the termination of their employment with Straitshot including, without limitation, Prudell's and Radford's obligations to: refrain from using, communicating or divulging Straitshot confidential and proprietary information to or on behalf of Telekenex; to refrain from soliciting Straitshot employees; and to return Straitshot's documents upon termination of their Straitshot employment.

329.   Telekenex had knowledge of Straitshot's contractual relationships with Prudell and Radford.

330.   Telekenex has intentionally interfered with Straitshot's contractual relationships with Prudell and Radford by inducing or causing a breach of these contractual relationships.

331.   Telekenex had a duty of noninterference with Straitshot's contractual relations with Prudell and Radford.

332.   Straitshot has suffered damages as a direct result of Telekenex's interference with Straitshot's contractual relations with Prudell and Radford and is entitled to recover those damages from Telekenex.

## VII.   THIRD CAUSE OF ACTION
### (Breach of Duty of Loyalty against Prudell, Radford and Summers)

333.   Straitshot realleges and incorporates herein by reference the allegations contained above.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 75
CASE NO. C10-268 TSZ

Summit Law Group PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

334.    Prudell, Radford and Summers had a duty of loyalty to their employer Straitshot not to solicit or help solicit Straitshot's customers and business prospects on behalf of a competitor.

335.    Prudell, Radford and Summers breached their duty of loyalty to Straitshot by soliciting Straitshot's customers and business prospects on behalf of Telekenex and by working with Mammoth to port the Straitshot customer circuits to Telekenex while Prudell, Radford and Summers were employed by Straitshot.

336.    Straitshot has suffered damages as a direct result of Prudell's, Radford's and Summers' breaches of their duty of loyalty to Straitshot and Straitshot is entitled to recover those damages from Prudell, Radford and Summers.

## VIII.   FOURTH CAUSE OF ACTION
### (Interference with Contractual Relations against all Defendants)

337.    Straitshot realleges and incorporates herein by reference the allegations contained above.

338.    Straitshot had valid contractual relationships with each of its customers including without limitation each of the customers described above.

339.    Defendants had knowledge of Straitshot's contractual relationships with Straitshot customers.

340.    Defendants have intentionally interfered with Straitshot's contractual relationships with Straitshot customers by inducing or causing a breach or termination of these contractual relationships.

341.    Defendants had a duty of noninterference with Straitshot's contractual relations with Straitshot customers.

342.    Straitshot has suffered damages as a direct result of Defendants' interference with Straitshot's contractual relations with its customers and is entitled to recover those damages from Defendants.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 76
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

## IX.    FIFTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets Against All Defendants)

343.    Straitshot realleges and incorporates herein by reference the allegations contained above.

344.    Straitshot's customer information, including without limitation names, contact information, terms of customer contracts, dates of Straitshot contract termination, pricing, details of network architecture, firewall controls, network addressing, and other sensitive data about each customer's network requirements and usage, is a trade secret.

345.    Defendants misappropriated Straitshot's trade secrets.

346.    Defendants' misappropriation of Straitshot's trade secrets was a proximate cause of damages to Straitshot.

347.    As a result of the misappropriation, Defendants received money or benefits that in justice and fairness belong to Straitshot.

348.    The misappropriation was willful and malicious.

349.    Straitshot is entitled to an award of exemplary damages against Defendants pursuant to RCW 19.108.030.

350.    Straitshot is entitled to an award of attorney's fees pursuant to RCW 19.108.040.

## X.    SIXTH CAUSE OF ACTION

### (Violation of the Lanham Act Against Telekenex, Zabit, Chaney, Prudell and Radford)

351.    Straitshot realleges and incorporates herein by reference the allegations contained above.

352.    Telekenex, Zabit, Chaney, Prudell and Radford made false statements about Straitshot including without limitation that Straitshot was going out of business.

353.    Telekenex, Zabit, Chaney, Prudell and Radford's statements deceived or had the tendency to deceive a substantial portion of the intended audience for those statements.

354.    Telekenex, Zabit, Chaney, Prudell and Radford's deception was material and was likely to influence purchasing decisions.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

355.     Telekenex's services are, and Straitshot's services were, in interstate commerce.

356.     There is likelihood if not a probability of injury to Straitshot, including without limitation declination of sales and loss of good will, resulting from the statements.

357.     Straitshot is entitled to recover from Telekenex, Zabit, Chaney, Prudell and Radford, Telekenex's profits, Straitshot's damages, and Straitshot's attorney's fees and costs.

## XI.     SEVENTH CAUSE OF ACTION
### (Violation of the Consumer Protection Act Against All Defendants)

358.     Straitshot realleges and incorporates herein by reference the allegations contained above.

359.     Defendants acted unfairly and deceptively including by making statements that Straitshot is going out of business, by using Straitshot's trade secrets and confidential information, and by inducing Straitshot's customers to breach their contracts with Straitshot.

360.     Defendants' unfair and deceptive acts occurred in the conduct of trade or commerce.

361.     Defendants' unfair and deceptive acts affect the public interest.

362.     Defendants' unfair and deceptive acts resulted in injury to Straitshot in its business.

363.     Straitshot is entitled to recover against Defendants treble damages, attorney's fees, and statutory costs.

## XII.     EIGHTH CAUSE OF ACTION
### (Federal RICO Claim Against All Defendants)

364.     Straitshot realleges and incorporates herein by reference the allegations contained above.

365.     Defendants have acted unlawfully in violation of 18 U.S.C. §§ 1962(a), 1962(c), and 1962(d).

366.     Each Defendant is a person liable for his or its conduct under the RICO statutes.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

367.     Defendants are engaging in a continuing pattern of racketeering activity by (a) defrauding Straitshot of its trade secrets and using the misappropriated trade secrets through multiple schemes of racketeering involving the use of interstate wire communications in violation of 18 U.S.C. § 1343. (b) harming Straitshot customers in addition to Straitshot; (c) committing similar acts of racketeering against other parties, such as Charlotte, Eat 'n Park, EFA, Dealtree, and Bryco, in violation of 18 U.S.C. §§ 1341 and 1343; (d) spoliation of evidence and obstruction of justice in violation of 18 U.S.C. § 1512(c)(1); (e) false testimony by Summers on February 16, 2009, August 3, 2009, and November 16, 2010, which amounts to obstruction of justice in violation of 18 U.S.C. §§ 1503(a) and 1512(c)(2); and (f) fraudulent transfer of  assets by Telekenex and Telekenex IXC to IXC, Inc. and IXC Holdings, Inc. in August 2010, involving use of mail and interstate wire communications in violation of 18 U.S.C. §§ 1341 and 1343.

368.     These schemes satisfy the continuity and pattern requirement because they involve multiple, extensive schemes with a wide variety of predicate acts spanning October 2008 to November 2010 and threatening to continue in the future.  They involve multiple victims, including Straitshot and its former customers, and similar acts of racketeering against other parties, such as Charlotte, Eat 'n Park, EFA, Dealtree, and Bryco.  The evidence shows that racketeering acts were and are Defendants' regular way of doing business and threatened repetition in the future, even after Straitshot terminated its services and closed its doors in 2009. The closure of Straitshot did not end Defendants' racketeering activity.

369.     Defendants joined together to form an enterprise whose common purpose is to defraud Straitshot of its trade secrets and use the misappropriated trade secrets to unlawfully cause Straitshot's customers to abandon their Straitshot contracts and move, enlarge, and lengthen their business to and with Telekenex, for the benefit of their common enterprise and its individual members ("Defendants' Enterprise").  Defendants' Enterprise engages in interstate commerce and is ongoing.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

370.     Defendants each receive income from their pattern of racketeering activity and use or invest that income to establish, operate, or acquire an interest in Defendants' Enterprise ("Defendants' Investment").

371.     Defendants also used Defendants' Investment to directly and wrongfully compete with Straitshot and to fund further theft and use by Defendants of Straitshot's trade secrets, and to use the misappropriated trade secrets to further wrongful inducement of Straitshot's customers to abandon their Straitshot contracts.

372.     Each Defendant conducts or participates in the conduct of Defendants' Enterprise's affairs through a pattern of racketeering activity for the benefit of Defendants' Enterprise and each Defendant's benefit.

373.     Each Defendant has conspired and continues to conspire to violate 18 U.S.C. §§ 1962(a) and 1962(c).

374.     Straitshot has been and is being damaged by Defendants' Enterprise and by Defendants' investment of income in Defendants' Enterprise.

375.     Straitshot is entitled to recover against Defendants treble damages, attorney's fees, and costs.

### XIII.   NINTH CAUSE OF ACTION
### (Washington Criminal Profiteering Act Claim Against All Defendants)

376.     Straitshot realleges and incorporates herein by reference the allegations contained above.

377.     Defendants have acted unlawfully in violation of RCW 9A.82.001 *et seq.*

378.     Each Defendant is a person liable for his or its conduct under the Washington Criminal Profiteering Act.

379.     Defendants joined together to form an enterprise whose common purpose is to defraud Straitshot of its trade secrets and use the misappropriated trade secrets to unlawfully cause Straitshot's customers to abandon their Straitshot contracts and move, enlarge and lengthen their

FOURTH AMENDED COMPLAINT FOR DAMAGES - 80
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

business to and with Telekenex, for the benefit of their common enterprise and its individual members ("Defendants' Enterprise").

380.    Defendants engaged in a continuing pattern of criminal profiteering activity by defrauding Straitshot of its trade secrets and using the misappropriated trade secrets to wrongfully induce Straitshot's customers to abandon their Straitshot contracts and move their business to Telekenex for the financial benefit and purpose of operating the Defendants' Enterprise and for each Defendant's financial gain in violation of the Washington Criminal Profiteering Act. Defendants acted with a common intent toward and scheme toward and concerning Straitshot and acted through the Defendants' Enterprise.

381.    Defendants have stolen Straitshot trade secrets valued at more than $5,000.

382.    Defendants have each knowingly received proceeds derived from Defendants' Enterprise and used such to establish or operate Defendants' Enterprise and for their financial gain ("Defendants' Investment").

383.    Defendants conspired to engage in a pattern of criminal profiteering for the purpose of receiving income from the criminal profiteering and using that income to operate the Defendants' Enterprise.

384.    Defendants used Defendants' Investment to directly and wrongfully compete with Straitshot, to fund further theft and use by Defendants of Straitshot's trade secrets, and to use the misappropriated trade secrets to further wrongful inducement of Straitshot's customers to abandon their Straitshot contracts.

385.    Straitshot has been damaged by Defendants' Enterprise and by Defendants' investment of profiteering income in Defendants' Enterprise.

386.    Straitshot is entitled to recover against Defendants treble damages, attorney's fees, and costs.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

## XIV.   TENTH CAUSE OF ACTION
### (Promissory Estoppel Against Mammoth)

387.    Straitshot realleges and incorporates herein by reference the allegations contained above.

388.    In November 2008, Mammoth agreed to defer payment of $120,000 of fees Straitshot owed Mammoth and to permit Straitshot to pay subsequent invoices when they came due.

389.    Mammoth understood that the Deferral Agreement was a critical component to Straitshot's restructuring plan and that Straitshot was relying on the Deferral Agreement to make its plan work.  Mammoth understood that absent the Deferral Agreement, Straitshot would have pursued other restructuring options, including potentially filing for bankruptcy and selling off its assets to pay secured creditors (which did not include Mammoth) or, alternatively, moving all of its circuits from Mammoth to one of Mammoth's competitors.

390.    As anticipated by Straitshot and Mammoth, Mammoth's approval of the Deferral Agreement caused Straitshot to abandon its other restructuring options, including potentially filing for bankruptcy and selling off its assets to pay secured creditors (which did not include Mammoth) or, alternatively, moving all of its circuits from Mammoth to one of Mammoth's competitors, either of which would have provided value to Straitshot's secured creditors and permitted Straitshot to remain a going concern.

391.    Straitshot's reliance upon Mammoth's promise was justified.

392.    Injustice can be avoided only by enforcing Mammoth's promise and compensating Straitshot for the significant damages resulting from Mammoth's duplicity.

## XV.    ELEVENTH CAUSE OF ACTION
### (Breach of Contract Against Mammoth)

393.    Straitshot realleges and incorporates herein by reference the allegations contained above.

FOURTH AMENDED COMPLAINT FOR DAMAGES - 82
CASE NO. C10-268 TSZ

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

394.    Pursuant to the Written Contract, Mammoth was forbidden from disclosing to third parties, confidential and proprietary information regarding Straitshot's system including pricing. Mammoth breached the Written Contract by divulging confidential and proprietary information, including pricing, to Straitshot's competitor Telekenex.

395.    Straitshot has suffered damages as a direct result of Mammoth's breach of the Written Contract and is entitled to recover those damages from Mammoth.

## XVI.   TWELFTH CAUSE OF ACTION
### (Tortious Interference With Contractual Expectancy Against Mammoth)

396.    Straitshot realleges and incorporates herein by reference the allegations contained above.

397.    Straitshot had valid contractual relationships with Voxitas.

398.    Mammoth had knowledge of Straitshot's contractual relationship with Voxitas.

399.    Mammoth has intentionally interfered with Straitshot's contractual relationship with Voxitas by inducing or causing a breach of this contractual relationship.

400.    Mammoth had a duty of noninterference with Straitshot's contractual relations with Voxitas.

401.    Straitshot has suffered damages as a direct result of Mammoth's interference with Straitshot's contractual relations with Voxitas and is entitled to recover those damages from Mammoth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Straitshot Communications, Inc. prays for judgment as follows:

A.    For money damages in an amount to be established at trial;

B.    For exemplary damages;

C.    For an award of Straitshot's attorneys fees and costs; and

D.    For such other and further legal and equitable relief as the Court may deem just and proper.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

1    DATED this 6th day of December, 2010.

2                                    Respectfully submitted,

3                                    SUMMIT LAW GROUP PLLC

4                                    By /s/ Jessica L. Goldman

5                                        Jessica L. Goldman, WSBA #21856
                                         SUMMIT LAW GROUP, PLLC
6                                        315 5th Avenue S, Suite 1000
                                         Seattle, WA  98104-2682
7                                        Phone:  206.676.7000
                                         Fax:  206.676.7001
8                                        *jessicag@summitlaw.com*

9
                                         Leonard A. Gail
10                                       *(Admitted Pro Hac Vice)*
                                         MASSEY & GAIL LLP
11                                       50 East Washington Street, Suite 400
                                         Chicago, IL  60602
12                                       Phone:  312.283.1590
                                         Fax:  312.379.0467
13                                       *lgail@masseygail.com*

14
                                         *Attorneys for Plaintiff*
15

16

17

18

19

20

21

22

23

24

25

26

FOURTH AMENDED COMPLAINT FOR DAMAGES - 84
CASE NO. C10-268 TSZ

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the

3

Court using the CM/ECF system which will send notification of such filing to the following:

4

5

Leigh Ann Collings Tift
LITTLER MENDELSON, P.C.

A. Chad Allred
ELLIS LI & MCKINSTRY

6

One Union Square
600 University Street, Suite 3200

Market Place Tower
2025 First Avenue, Penthouse A

7

Seattle, WA  98101-3122
*ltift@littler.com*

Seattle, WA  98121
*callred@elmlaw.com*

8

9

Kenneth J. Diamond
WINTERBAUER & DIAMOND PLLC

10

1200 Fifth Avenue, Suite 1700
Seattle, WA  98101

11

*ken@winterbauerdiamond.com*

12

13

DATED this 6th day of December, 2010.

14

/s/ Cheryl A. McCrum

15

Cheryl A. McCrum
Legal Assistant

16

SUMMIT LAW GROUP, PLLC
315 5th Avenue S, Suite 1000

17

Seattle, WA  98104-2682
Phone:  206.676.7000

18

Fax:  206.676.7001
*cherylm@summitlaw.com*

19

20

21

22

23

24

25

26

FOURTH AMENDED COMPLAINT FOR DAMAGES - 85
CASE NO. C10-268 TSZ