THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STRAIGHTSHOT COMMUNICATIONS,
INC., a Washington Corporation, et al.

                Plaintiffs,

vs.

TELEKENEX, INC., a Delaware Corp., et al.

                Defendants.

No.  C10-268Z

ORDER

THIS MATTER comes before the Court on two motions: (1) the deferred motion for summary judgment filed by plaintiffs/third party defendants Straightshot Communications, Inc. ("SCI"), Straightshot RC, LLC ("SRC"), Claritage Strategy Fund, LP ("Claritage"), Andrew Gold, and Stephen Perry (collectively the "Straightshot parties"), docket no. 157; and (2) Defendant Mammoth Networks, LLC's ("Mammoth") motion for reconsideration, docket no. 217.  Having reviewed the papers filed in support of, and opposition to, the parties' motions, the Court enters the following Order.

ORDER - 1

# I.   <u>BACKGROUND</u>

At issue in the pending motions are several of Mammoth's claims against the Straightshot parties, all of which arise out of a March 2008 agreement (the "Security Agreement") between SCI and Claritage, pursuant to which Claritage agreed to loan SCI up to $2,300,000.00.  Perry Decl. Ex. 3, docket no. 160.  In exchange, SCI granted Claritage a security interest in all of SCI's tangible and intangible assets.  <u>Id.</u>  On April 18, 2008, Claritage perfected its security interest by filing a UCC-1 financing statement.  <u>Id.</u> at Ex. 4.  Over the course of the next several months, Claritage loaned SCI approximately $2,250,000.00 pursuant to the parties' agreement.  <u>Id.</u> at Exs. 5-8.  When SCI failed to meet its obligations to repay the loans, Claritage sent a demand for payment, and notified SCI that failure to comply with its obligations under the Security Agreement could result in Claritage foreclosing on its security interest.  <u>Id.</u> at Ex. 9.  In June 2009, Claritage assigned its rights under the Security Agreement to its wholly owned subsidiary, SRC.  <u>Id.</u> at Ex. 13.  SRC foreclosed on its security interest and acquired all of SCI's tangible and intangible assets that were subject to the Security Agreement in July 2009.  <u>Id.</u> at Ex. 14.

# II.   <u>DISCUSSION</u>

## A.   **Mammoth's Motion for Reconsideration, docket no. 217**

Motions for reconsideration are disfavored.  Local Rule CR 7(h)(1).  The Court will ordinarily deny a motion for reconsideration absent a showing of manifest error in

the prior ruling or a showing of new facts or legal authorities which could not have been brought to its attention with reasonable diligence.  Id.

In its third party complaint, Mammoth alleged that the July 2009 foreclosure by SRC was a fraudulent transfer.  See Answer, docket no. 78.  The Straightshot parties moved for summary judgment on Mammoth's fraudulent transfer claim, arguing that the foreclosure of a valid lien is not a fraudulent transfer.  Mot., docket no. 157. Mammoth responded that the foreclosure was fraudulent because SRC acquired all of SCI's assets in the foreclosure, including SCI's commercial tort claims, which were not covered by the parties' security agreement.  Resp., docket no. 180.  On March 1, 2011, the Court granted in part the Straightshot parties' motion for summary judgment and struck Mammoth's claim for fraudulent transfer (Third Cause of Action),[1] holding that the transfer was not fraudulent because SRC did not acquire all of SCI's assets in the foreclosure, only those assets that were subject to a valid lien.  Order, docket no. 214.  Thus, SRC did not acquire SCI's commercial tort claims because those claims were not subject to the lien, and there was no fraudulent transfer.  Id.

Mammoth now moves for reconsideration, arguing for the first time that the transfer of SCI's non-commercial tort claims in the foreclosure was a fraudulent

---

[1] The Court also struck Mammoth's claim for successor liability (Fifth Cause of Action) because it was predicated exclusively on Mammoth's claim for fraudulent transfer.  Order, docket no. 214.  Although Mammoth also moves for reconsideration of the dismissal of its successor liability claim, the Court need not address that claim separately because its fate is wholly dependent upon the viability of Mammoth's fraudulent transfer claim.

transfer under Washington's Uniform Fraudulent Transfer Act ("UFTA").[2]  Mammoth contends that the transfer of a debtor's property in a foreclosure of a valid lien is fraudulent if the debtor is engaged in actual fraud, i.e., if the transfer was made by the debtor with the intent of hindering or delaying the debtor's creditors, because, under UFTA, the enforcement of a security interest is only a valid defense to constructive fraud under RCW 19.40.041(a)(2), not actual fraud under RCW 19.40.041(a)(1).  See RCW 19.40.081(e)(2) (providing that the enforcement of a security interest is a valid defense to a claim of constructive fraud under RCW 19.40.041(a)(2)).  However, a secured creditor's enforcement of a security interest never gives rise to an actual fraud claim under UFTA because, unlike constructive fraud,[3] actual fraud requires a showing of intent by the debtor to hinder, delay, or defraud a creditor. RCW 19.04.041(a)(2)(i).  As a foreclosure is initiated by the secured creditor, without the consent or approval of the debtor, there can be no intent to defraud, and therefore UFTA's actual fraud provision does not apply.[4]

---

[2] Although the Court concludes that the substance of Mammoth's arguments lack merit, in the alternative, the Court DENIES Mammoth's motion for reconsideration on procedural grounds because it raises legal arguments that could have been brought in Mammoth's original motion.  Local Rule CR 7(h)(1).

[3] To prove constructive fraudulent transfer only requires a showing that the debtor transferred an asset without receiving a reasonably equivalent value, at a time when the debtor had unreasonably small assets or was unable to pay its debts as they came due.  RCW 19.40.041(a)(2)(i)-(ii).

[4] Mammoth appears to argue that UFTA's actual fraud provision applies to this foreclosure because Gold and Perry were involved in the corporate management of both SRC and SCI and had a sinister motive.  See Resp. at 7, docket no. 180 (noting

Moreover, even if the enforcement of a security interest were not a defense to actual fraud under RCW 19.40.041(a)(1), to prove a claim for fraudulent transfer, Mammoth still must show that the transferred property was an "asset" of SCI because a transfer of property is only actionable under UFTA if the property meets the statutory definition of an "asset."  RCW 19.40.011(12) (defining "transfer" as the disposal of an "asset").  Property does not meet the definition of an "asset" (and therefore is not subject to UFTA) to the extent it is encumbered by a valid lien.[5]  RCW 19.40.011(2)(i).  Here, the record reflects that "[t]he lien foreclosure that took place in July 2009 transferred only those assets of SCI subject to a perfected security interest."  Order at 5, docket no. 214; see also Perry Decl., Ex. 3 at ¶ 13(e) (noting that, after satisfying the amounts owed to SRC, the surplus value of any of the collateral subject

---

that Gold's involvement in both companies demonstrates that SCI retained control of its assets after the transfer, one of the badges of fraud under RCW 19.40.041(b)); see also id. at 10-11.  Gold & Perry's involvement goes to the validity of the lien in the first instance, not the subsequent foreclosure.  There is no evidence of fraudulent intent at the time SCI entered into the Security Agreement with Claritage, and as such, the lien was valid.

[5] The Court's construction of UFTA does not render RCW 19.40.081(e)(2) meaningless, as Mammoth contends, because the enforcement of a security interest may, in some circumstances, result in the transfer of a debtor's assets for less than reasonably equivalent value.  See e.g., Preferred Funding, Inc. v. Jackson, 185 Or. App. 693, 698 61 P.3d 939 (2003) (applying Oregon's version of the UFTA and holding that "only equity in excess of the amount of the encumbering lien is an 'asset' under UFTA."); see also UFTA § 4 cmt. 3 ("The premise of [UFTA] is that when a transfer is for security only, the equity or value of the asset that exceeds the amount of the debt secured remains available to unsecured creditors and thus cannot be regarded as the subject of a fraudulent transfer merely because of the encumbrance resulting from an otherwise valid security transfer.").

to the Security Agreement belongs to SCI).  Therefore, SCI only transferred property

subject to a valid lien, and as such, the transferred property does not meet the

definition of an "asset," a necessary prerequisite to a fraudulent transfer claim.  See,

e.g., Thompson v. Hanson, 142 Wn. App. 53, 66, 174 P.3d 120 (2007) ("Foreclosure .

. . for no net profit, means the asset was fully encumbered and therefore not an 'asset'

for purpose of the UFTA.").  Accordingly, the Court DENIES Mammoth's motion for

reconsideration, docket no. 217, because the lien foreclosure did not result in an

actionable "transfer" of SCI's property.

### B.    Plaintiffs' Motion for Summary Judgment, docket no. 157

In its March 1, 2011 Order, the Court deferred ruling on the Straightshot

parties' motion for summary judgment on Mammoth's unlawful corporate distribution

claim (Sixth Cause of Action), and requested supplemental briefing.  Order, docket

no. 214.  Mammoth argues that the 2009 asset foreclosure constituted an "unlawful"

distribution[6] of SCI's assets under RCW 23B.08.310, which provides:

> A director who votes for or assents to a distribution made in violation of
> RCW 23B.06.400 . . . is personally liable to the corporation for the

---

[6] Washington's Business Corporation Act (the "WBCA") defines a "distribution" as a:

> direct or indirect transfer of money or other property, except its own
> shares, or incurrence of indebtedness by a corporation to or for the
> benefit of its shareholders in respect to any of its shares.  A distribution
> may be in the form of a declaration or payment of a dividend; a
> distribution in partial or complete liquidation, or upon voluntary or
> involuntary dissolution; a purchase, redemption, or other acquisition of
> shares; a distribution of indebtedness; or otherwise.

RCW 23B.01.400(7).

amount of the distribution that exceeds the amount that could have been distributed without violating RCW 23B.06.400 . . . if it is established that the director did not perform the director's duties in compliance with RCW 23B.08.300.

RCW 23B.08.310(1).  The WBCA also imposes personal liability on a shareholder who "accepts a distribution made in violation of RCW 23B.06.400 . . . if it is established that the shareholder accepted the distribution knowing that it was made in violation of RCW 23B.06.400."  RCW 23B.08.310(3).

A distribution is made in violation of RCW 23B.06.400 if, after giving it effect:

(a)     The corporation would not be able to pay its liabilities as they become due in the usual course of business; or

(b)     The corporation's total assets would be less than the sum of its total liabilities plus, unless the articles of incorporation permit otherwise, the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution

RCW 23B.06.400(2).

In this case, the threshold question that the Court must address is when the allegedly unlawful distribution occurred, because to prove that a distribution is unlawful, Mammoth must present evidence of SCI's financial condition at the time the distribution occurred.  See id.

In the case of a distribution of indebtedness, the WBCA provides that the distribution occurs on the date the indebtedness is distributed.  RCW 23B.06.400(4)(b)(ii).  The language of the WBCA is taken from the Model Business Corporation Act ("MBCA").  Compare RCW 23B.06.400(4)(b)(ii) with MBCA

§ 6.40(e)(2).  The commentary to the MBCA similarly indicates that the lawfulness of a distribution of indebtedness is measured as of the date the indebtedness is incurred, not the subsequent date when it is actually paid.  MBCA § 1.40 cmt. 3 (2005) ("If a corporation incurs indebtedness in connection with a distribution (as in the case of a distribution of a debt instrument or installment purchase of shares), the creation, incurrence or distribution of the indebtedness is the event which constitutes the distribution rather than the subsequent payment of the debt by the incorporation [sic].") (emphasis added); Report of Comm. on Corporate Laws, 34 BUS. LAW. 1867, 1878 (1979) ("Where a corporation incurs indebtedness in a distribution . . . the creation or incurrence of the indebtedness is the event which constitutes the distribution, rather than the subsequent payment of the debt by the corporation."). Accordingly, the distribution occurred when SCI entered into the Security Agreement with Claritage in March 2008.  Mammoth has submitted no evidence that demonstrates that, in March 2008, SCI was incapable of meeting its obligations as they came due, or that SCI's total assets exceeded its liabilities.  The Court concludes as a matter of law that the distribution was not unlawful.  See RCW 23B.06.400(2)(a)-(b).

Mammoth argues that SCI made a second distribution in July 2009 when SRC foreclosed on the Security Agreement and acquired SCI's assets.  Specifically, Mammoth contends that, to the extent SCI transferred assets valued in excess of SRC's security interest, the transfer of that excess value constitutes an unlawful distribution.

ORDER - 8

The Court concludes, however, the only distribution that occurred was in March 2008.[7]

In addition, even if the foreclosure could constitute a distribution, the Court has already held that SCI did not distribute assets in excess of the amounts secured by the parties' agreement. To the contrary, SRC only acquired SCI's assets in the foreclosure to the extent they were encumbered by the Security Agreement. See Perry Decl., Ex. 3 at ¶ 13(e), docket no. 160. SCI's assets exceeding the value of SRC's security interest remain the property of SCI.[8]

## III.   CONCLUSION

For the foregoing reasons, the Court DENIES Mammoth's motion for reconsideration, docket no. 217. The Court GRANTS the deferred portion of the Straightshot parties' motion for summary judgment, docket no. 157, and DISMISSES with prejudice Mammoth's claim for unlawful corporate distributions in violation of RCW 23B.08.310 (Sixth Cause of Action).

---

[7] A foreclosure is not an actionable "distribution" because it is automatic; it requires no assent or approval of the debtor's directors. Therefore, Mammoth cannot show that Perry and Gold assented to a distribution in violation of their duties as corporate officers. RCW 23B.08.310(1). Similarly, SRC is not liable under RCW 23B.08.310(3) because it was not a shareholder of SCI at the time of the foreclosure. See id.; RCW 23B.01.400(30). Unlike UFTA, the WBCA does not have a provision that imposes liability for unlawful distributions on subsequent transferees.

[8] There remains a factual dispute over the value of SCI's assets, and as such, the Court cannot determine at this time whether SRC acquired all, or only a portion, of SCI's assets in the foreclosure.

IT IS SO ORDERED.

DATED this 9th day of May, 2011.

_Thomas S. Zilly_
Thomas S. Zilly
United States District Judge